## UNITED STATES v. SEYMOUR.

### No. 1536.

District Court, D. Nebraska, Lincoln Division. May 13, 1931.

Charles E. Sandall, U. S. Atty., of Omaha, Neb., and Robert Van Pelt, Asst. U. S. Atty., of Lincoln, Neb.

T. S. Allen and Robert Devoe, both of Lincoln, Neb., for defendant.

MUNGER, District Judge.

By a demurrer, which in effect is a general demurrer, the defendant challenges the sufficiency of the charge against him in the indictment. The indictment contains eight counts, similar in nature. In each it is alleged that the defendant violated section 125 of the Penal Code of the United States (18 U. S. Code § 231 [18 USCA § 231]) which provides: "Whoever, having taken an oath before a competent tribunal, officer, or person, in any case in which a law of the United States authorizes an oath to be administered, that he will testify, declare, depose, or certify truly, or that any written testimony, declaration, deposition, or certificate by him subscribed, is true, shall willfully and contrary to such oath state or subscribe any material matter which he does not believe to be true, is guilty of perjury, and shall be fined not more than $2,000 and imprisoned not more than five years."

The indictment sets forth the time of the alleged perjury as on July 21, 1930, and the occasion as a hearing at Lincoln, Neb., before United States Senator Gerald P. Nye. It is alleged that the Senate of the United States on April 8, 1930, had adopted a resolution as follows:

"Resolved, That a special committee consisting of five Senators, to be appointed by the Vice-President is hereby authorized and directed to investigate the campaign expenditures of the various candidates for the United States Senate, the names of the persons, firms or corporations subscribing, the amount contributed, the method of expenditure of said sums, and all facts in relation thereto, not only as to the subscriptions of money and expenditures thereof but as to the use of any other means or influence, includ-

ing the promise or use of patronage, and all other facts in relation thereto which would not only be of public interest but which would aid the Senate in enacting any remedial legislation or in deciding any contest which might be instituted involving the right to a seat in the United States Senate.

"The investigation hereby provided for, in all the respects above enumerated, shall apply to candidates and contests before senatorial primaries, senatorial conventions, and the contests and campaign terminating in the general election in November, 1930.

"No Senator shall be appointed upon said committee from a State in which a Senator is to be elected in the general election in 1930.

"Said committee is hereby authorized to act upon its own initiative and upon such information as in its judgment may be reasonable or reliable. Upon complaint being made before said committee under oath by any person, persons, senatorial candidate, or political committee, setting forth allegations as to facts which under this resolution it would be the duty of said committee to investigate, the said committee shall investigate such charges as fully as though it were acting upon its own motion, unless after a hearing upon such complaint the committee shall find that the allegations in said complaint are immaterial or untrue.

"Said committee is hereby authorized in the performance of its duties to sit at such times and places, either in the District of Columbia, or elsewhere, as it deems necessary or proper. It is specifically authorized to require the attendance of witnesses by subpoena or otherwise; to require the production of books, papers, and documents; and to employ counsel, experts, clerical, and other assistants; and to employ stenographers at a cost not exceeding 25 cents per one hundred words.

"Said committee is hereby specifically authorized to act through any subcommittee authorized to be appointed by said committee. The chairman of said committee or any member of any subcommittee may administer oaths to witnesses and sign subpoenas for witnesses; and every person duly summoned before said committee, or any subcommittee thereof, who refuses or fails to obey the process of said committee or who appears and refuses to answer questions pertinent to said investigation shall be punished as prescribed by law.

"The expenses of said investigation, not exceeding in the aggregate $100,000, shall be paid from the contingent fund of the Senate on vouchers signed by the chairman of the committee or the chairman of any subcommittee.

"All hearings before said committee shall be public, and all orders or decisions of the committee shall be public.

"The committee shall make a full report to the Senate on the first day of the next session of the Congress."

It is further alleged that the vice president of the United States appointed a committee of five United States Senators pursuant to the terms of the resolution, including Senator Nye as one of the members, and that, at a meeting of the committee at which four of its members were present, action was taken as follows: "A discussion of future procedure was had. The Chairman was unanimously authorized to act as a sub-committee and to appoint sub-committees of one or more members to hold hearings as in his judgment was desirable."

It is further alleged that the committee appointed under the terms of the resolution of the United States Senate, through a subcommittee of one, composed of Senator Gerald P. Nye, proceeded to make an investigation in Nebraska with a view to making a report to the Senate upon matters referred to the committee, and that, in the course of the investigation, the defendant appeared and took an oath before Gerald P. Nye, United States Senator, a member and chairman of the committee. It is also alleged that the defendant took his oath that he would testify truly, and it is alleged that he willfully testified falsely. As to the matter of inquiry, upon which the testimony of the defendant was alleged to have been given, it is charged that the Governor of Nebraska had duly designated the 12th day of August, 1930, as the date for holding a primary election for a nomination by the political parties of candidates for public offices to be voted for at the general election in 1930, and that one of these offices was that of a United States Senator from Nebraska. The indictment states that: "Prior to the aforesaid Primary election, applications had been respectively filed in the office of the Secretary of State of Nebraska, by and on behalf of George W. Norris of McCook, Nebraska, and George W. Norris of Broken Bow, Nebraska, requesting that each of their names be placed upon the official ballot of the Republican party for the Primary election to be held on the twelfth day of August, in the year nineteen hundred thirty, as a can-

didate for United States Senator, and a statement in writing was filed by W. M. Stebbins of Gothenburg, Nebraska, as provided by law, accepting a written application filed by sufficient qualified voters of the State of Nebraska, requesting that said W. M. Stebbins' name be placed upon the official Primary ballot of the Republican party for the Primary election to be held the twelfth day of August, in the year nineteen hundred thirty, as aforesaid, as a candidate for the office of United States Senator from Nebraska."

In the several counts it is alleged that the defendant falsely testified, in substance, that he had had no contact with the pending senatorial campaign and had not conferred with any one about it; had heard only through the press that money was available for use in the primary senatorial campaign; had seen no evidence of availability of money in the campaign; had not spent any money in connection with it; that no money or credits had been placed at his disposal for use in it; that he had no knowledge of any contributions made for or against the candidacy of any candidate for the United States Senate; that he had had no part in encouraging the candidacy of George W. Norris of Broken Bow, Neb., with (sic) the Republican nomination for United States Senator at the primary election; that he had not taken part in any conferences relating to any political situation in Nebraska concerning the candidates for United States Senator at the primary election; and that he did not know of George W. Norris of Broken Bow, Neb., until he saw his filing in the newspapers, and had no information concerning him until he saw this filing in the newspapers. In the arguments offered upon the demurrer it was conceded that the power of the committee of the Senate to make inquiry of the defendant depended upon some constitutional grant of power, express or implied, whereby the Senate committee was authorized to make the investigation which was outlined in the Senate resolution under which Senator Nye purported to act. This constitutional limitation of such an inquiry is well established. Kilbourn v. Thompson, 103 U. S. 168, 190, 192, 26 L. Ed. 377; Interstate Commerce Commission v. Brimson, 154 U. S. 447, 478, 14 S. Ct. 1125, 38 L. Ed. 1047; In re Chapman, Petitioner, 166 U. S. 661, 668, 17 S. Ct. 677, 41 L. Ed. 1154; Ellis v. Int. Commerce Commission, 237 U. S. 434, 445, 35 S. Ct. 645, 59 L. Ed. 1036; Fed. Trade Commission v. American Tobacco Co., 264 U. S. 298, 305, 306, 44 S. Ct. 336, 68 L. Ed. 696, 32 A. L. R. 786; McGrain v. Daugherty, 273 U. S. 135, 174, 176, 178, 47 S. Ct. 319, 71 L. Ed. 580, 50 A. L. R. 1; Reed v. County Commissioners, 277 U. S. 376, 388, 48 S. Ct. 531, 72 L. Ed. 924; Sinclair v. United States, 279 U. S. 263, 291, 49 S. Ct. 268, 73 L. Ed. 692.

The inquiries made of the defendant in this case relate to his testimony concerning his knowledge and acts in connection with a campaign preceding a primary election in Nebraska, at which party candidates for United States Senator were to be selected. The Seventeenth Amendment to the United States Constitution provides for the election of such Senators by the people of each state, by voters having qualifications requisite for electors of the most numerous branch of the state Legislature. The statutory method of selection of such senators in the state of Nebraska may be outlined as follows: At the general election, where a senator is to be chosen and which is held in November, voters may use only an official printed ballot, upon which is printed a list of the candidates for public office, including the office of United States Senator (Neb. Comp. Stats. 1929, §§ 32-501 to 32-525). The returns of the votes at the general election are canvassed by election boards, and by the state Legislature, and the results declared. Id. Sections 32-901 to 32-933.

In order to have one's name printed upon the official ballot as a candidate for United States Senator, compliance must be had with the provisions of other statutes of Nebraska, relating to what is called a primary election. This primary election is held on the second Tuesday in August preceding the general election. Only official printed ballots may be used at the primary election and these are prepared by a public officer, who may print thereon the names of those candidates only who have been selected in accordance with the terms of the statutes governing the primary election. The name of a candidate for United States Senator may be proposed by a written application of the candidate filed with the secretary of state, or may be proposed by a petition of electors likewise filed. If it is desired that his name shall be followed on the official primary ballot by the name of a political party, indicating that he is seeking to be the regular candidate of that party, the application states the name of such political party. At the primary election the votes are cast and the returns are then canvassed, and the name of the candidate having the plurality of votes among those who were designated as candidates of such a political party is placed upon the official ballot to be

used at the general November election, as the nominee for United States Senator, with the name of the political party following his name upon the ballot. There are provisions of law for the printing of the names of other candidates for United States Senator upon the ballots at the primary election, to be followed by the words "by petition" and otherwise. There are also provisions by which voters may write the names of other candidates upon the ballots. The general plan of the primary elections is to be found in Neb. Comp. Stats. 1929, §§ 32-1101 to 32-1174.

■■ In support of the indictment the government asserts that the inquiries propounded to and the testimony given by the defendant were material to the investigation authorized by the Senate resolution, and was within the scope of the Senate's right of investigation, because it was in aid of legislation which the United States Senate could enact under Section 4 of article 1 of the United States Constitution, which reads as follows: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators."

There can be no doubt of the power of Congress to obtain information as to legislation which it is authorized to enact, and that it may require witnesses to testify for that purpose. McGrain v. Daugherty, 273 U. S. 135, 160, 47 S. Ct. 319, 71 L. Ed. 580, 50 A. L. R. 1; Sinclair v. United States, 279 U. S. 263, 291, 49 S. Ct. 268, 73 L. Ed. 692; 40 Harv. Law Rev. 153.

It appears from the indictment that the information sought from the defendant and the testimony which he gave related to the acts of himself and others in procuring or aiding George W. Norris of Broken Bow, Neb., to seek to become a candidate for United States Senator at the primary election on August 12, 1930, and in seeking thereby to aid the candidacy at that election of W. M. Stebbins as another proposed candidate for United States Senator, and in seeking thereby to injure the candidacy at that election of George W. Norris of McCook, Neb., as another proposed candidate for United States Senator. The inquiry related also to the receipt of money and property from W. M. Stebbins and its expenditures in support of proposed candidacy of George W. Norris of Broken Bow. The testimony was given on July 21, 1930, and related to the defendant's conduct before that time. The right of Congress to legislate with reference to primary elections similar to such primary elections as were permissible in Nebraska in 1930 has been the subject of decisions in adjudicated cases.

In United States v. Gradwell, 243 U. S. 476, 487, 37 S. Ct. 407, 411, 61 L. Ed. 857, the court left undecided the question whether a primary should be treated as an election within the meaning of article 1, § 4, of the United States Constitution, but, in referring to the question, said:

"The constitutional warrant under which regulations relating to congressional elections may be provided by Congress is in terms applicable to the 'times, places, and manner of holding elections (not nominating primaries) for Senators and Representatives.' Primary elections, such as it is claimed the defendants corrupted, were not only unknown when the Constitution was adopted, but they were equally unknown for many years after the law, now § 19, was first enacted. They are a development of comparatively recent years, designed to take the place of the nominating caucus or convention, as these existed before the change, and even yet the new system must be considered in an experimental stage of development, under a variety of state laws.

"The claim that such a nominating primary, as distinguished from the final election, is included within the provision of the Constitution of the United States, applicable to the election of Senators and Representatives, is by no means indisputable. Many state supreme courts have held that similar provisions of state constitutions relating to elections do not include a nominating primary. Ledgerwood v. Pitts, 122 Tenn. 570, 125 S. W. 1036; Montgomery v. Chelf, 118 Ky. 766, 82 S. W. 388; State ex rel. Von Stade v. Taylor, 220 Mo. 619, 119 S. W. 373; State v. Nichols, 50 Wash. 508, 97 P. 728; Gray v. Seitz, 162 Ind. 1, 69 N. E. 456; State v. Erickson, 119 Minn. 152, 137 N. W. 385."

In that case it was pointed out that Congress had undertaken in 1842, in 1870, and in 1872, to regulate the manner of holding elections of members of Congress, but had afterwards repealed such statutes. Another act of Congress relating to a method of nominating and electing United States Senators was approved June 4, 1914 (38 Stat. 384), but by its terms was to expire in three years.

In Newberry v. United States, 256 U. S. 232, 41 S. Ct. 469, 470, 65 L. Ed. 913, a very full consideration was given to the power of Congress to regulate the conduct of primary elections for United States Senators. Truman H. Newberry had been convicted of a conspiracy to violate the Federal Corrupt Practices Act by expending, for the procurement of his nomination as a candidate for United States Senator, more money than was authorized by that act. The conviction was reversed by the Supreme Court. Four members of the court united in an opinion which held, in substance, that Congress did not have power, under article 1, § 4 of the United States Constitution, to regulate the manner of holding primary elections for United States Senator. In that opinion the court said:

"And the ultimate question for solution here is whether under the grant of power to regulate 'the manner of holding elections' Congress may fix the maximum sum which a candidate therein may spend, or advise or cause to be contributed and spent by others to procure his nomination.

"Section 4, article 1, of the Constitution provides: 'The times, places and manner of holding elections for Senators and Representatives, shall be prescribed in each state by the Legislature thereof; but the Congress may at any time by law make or alter such regulations, except as to the places of choosing Senators.' Here is the source of Congressional power over the elections specified. It has been so declared by this court—Ex parte Siebold, 100 U. S. 371, 25 L. Ed. 717; United States v. Gradwell, 243 U. S. 476, 481, 37 S. Ct. 407, 61 L. Ed. 857—and the early discussions clearly show that this was then the accepted opinion. The Federalist, LVIII, LIX, LX; Elliot's Debates, vol. II, 50, 73, 311; volume III, 86, 183, 344, 375; volume IV, 75, 78, 211.

"We find no support in reason or authority for the argument that because the offices were created by the Constitution, Congress has some indefinite, undefined power over elections for Senators and Representatives not derived from section 4. 'The government, then, of the United States, can claim no powers which are not granted to it by the Constitution, and the powers actually granted, must be such as are expressly given, or given by necessary implication.' Martin v. Hunter's Lessee, 1 Wheat. 304, 326, 4 L. Ed. 97. * * *

"Undoubtedly elections within the original intendment of section 4 were those where-

in Senators should be chosen by Legislatures and Representatives by voters possessing 'the qualifications requisite for electors of the most numerous branch of the state Legislature.' Article 1, §§ 2 and 3. The Seventeenth Amendment, which directs that Senators be chosen by the people, neither announced nor requires a new meaning of election and the word now has the same general significance as it did when the Constitution came into existence—final choice of an officer by the duly qualified electors. Hawke v. Smith, 253 U. S. 221, 40 S. Ct. 495, 64 L. Ed. 871, 10 A. L. R. 1504. Primaries were then unknown. Moreover, they are in no sense elections for an office but merely methods by which party adherents agree upon candidates whom they intend to offer and support for ultimate choice by all qualified electors. General provisions touching elections in Constitutions or statutes are not necessarily applicable to primaries—the two things are radically different. And this view has been declared by many state courts. People v. Cavanaugh, 112 Cal. 674, 44 P. 1057; State v. Erickson, 119 Minn. 152, 137 N. W. 385; State v. Taylor, 220 Mo. 618, 119 S. W. 373; State v. Woodruff, 68 N. J. Law, 89, 52 A. 294; Commonwealth v. Wells, 110 Pa. 463, 1 A. 310; Ledgerwood v. Pitts, 122 Tenn. 570, 125 S. W. 1036.

"If it be practically true that under present conditions a designated party candidate is necessary for an election—a preliminary thereto—nevertheless his selection is in no real sense part of the manner of holding the election. This does not depend upon the scheme by which candidates are put forward. Whether the candidate be offered through primary, or convention, or petition, or request of a few, or as the result of his own unsupported ambition does not directly affect the manner of holding the election. Birth must precede but it is no part of either funeral or apotheosis.

"Many things are prerequisites to elections or may affect their outcome—voters, education, means of transportation, health, public discussion, immigration, private animosities, even the face and figure of the candidate; but authority to regulate the manner of holding them gives no right to control any of these. It is settled, e. g., that the power to regulate interstate and foreign commerce does not reach whatever is essential thereto. Without agriculture, manufacture, mining, etc., commerce could not exist but this fact does not suffice to subject them to the con-

trol of Congress. Kidd v. Pearson, 128 U. S. 1, 9 S. Ct. 6, 32 L. Ed. 346.

"Elections of Senators by state Legislatures presupposed selection of their members by the people; but it would hardly be argued that therefore Congress could regulate such selection. In the Constitutional Convention of 1787 when replying to the suggestion that state Legislatures should have uncontrolled power over elections of members of Congress, Mr. Madison said: 'It seems as improper in principle, though it might be less inconvenient in practice, to give to the state Legislatures this great authority over the election of the representatives of the people in the general Legislature as it would be to give to the latter a like power over the election of their representatives in the state Legislatures.' Supplement to Elliot's Debates, vol. V, p. 402.

"We cannot conclude that authority to control party primaries or conventions for designating candidates was bestowed on Congress by the grant of power to regulate the manner of holding elections. The fair intendment of the words does not extend so far; the framers of the Constitution did not ascribe to them any such meaning. Nor is this control necessary in order to effectuate the power expressly granted. On the other hand, its exercise would interfere with purely domestic affairs of the state and infringe upon liberties reserved to the people.

"It should not be forgotten that, exercising inherent police power, the state may suppress whatever evils may be incident to primary or convention. As 'each house shall be the judge of the elections, qualifications and returns of its own members,' and as Congress may by law regulate the times, places and manner of holding elections, the national government is not without power to protect itself against corruption, fraud or other malign influences."

Three of the judges concurred in an opinion dissenting from these views of the four judges, and stated:

"It is contended that Congress has no power to regulate the amount of money that may be expended by a candidate to secure his being named in the primary election; that the power 'to regulate the manner of holding elections,' etc., relates solely to the general elections where Senators or Representatives are finally chosen. Why should 'the manner of holding elections' be so narrowly construed? An election is the choosing of a person by vote to fill a public office. In the na-

ture of things it is a complex process, involving some examination of the qualifications of those from whom the choice is to be made and of those by whom it is to be made; some opportunity for the electors to consider and canvass the claims of the eligibles; and some method of narrowing the choice by eliminating candidates until one finally secures a majority, or at least a plurality, of the votes. For the process of elimination, instead of tentative elections participated in by all the electors, nominations by parties or groups of citizens have obtained in the United States from an early period. Latterly the processes of nomination have been regulated by law in many of the states, through the establishment of official primary elections. But in the essential sense, a sense that fairly comports with the object and purpose of a Constitution such as ours, which deals in broad outline with matters of substance and is remarkable for succinct and pithy modes of expression, all of the various processes above indicated fall fairly within the definition of 'the manner of holding elections.' This is not giving to the word 'elections' a significance different from that which it bore when the Constitution was adopted, but is simply recognizing a content that of necessity always inhered in it. The nature of that instrument required, as Chief Justice Marshall pointed out in McCulloch v. Maryland, 4 Wheat. 316, 407, 4 L. Ed. 579; 'That only its great outlines should be marked, its important objects designated, and the minor ingredients which compose those objects be deduced from the nature of the objects themselves.' * * *

"But if I am wrong thus far—if the word 'elections' in article 1, section 4, of the Constitution must be narrowly confined to the single and definitive step described as an election at the time that instrument was adopted—nevertheless it seems to me too clear for discussion that primary elections and nominating conventions are so closely related to the final election, and their proper regulation so essential to effective regulation of the latter, so vital to representative government, that power to regulate them is within the general authority of Congress. It is matter of common knowledge that the great mass of the American electorate is grouped into political parties, to one or the other of which voters adhere with tenacity, due to their divergent views on questions of public policy, their interests, their environment, and various other influences, sentimental and historical. So strong with the great majority of voters are party associations, so potent the

party slogan, so effective the party organization, that the likelihood of a candidate succeeding in an election without a party nomination is practically negligible. As a result, every voter comes to the polls on the day of the general election confined in his choice to those few candidates who have received party nominations, and constrained to consider their eligibility, in point of personal fitness, as affected by their party associations and their obligation to pursue more or less definite lines of policy, with which the voter may or may not agree. As a practical matter, the ultimate choice of the mass of voters is predetermined when the nominations have been made. Hence, the authority of Congress to regulate the primary elections and nominating conventions arises, of necessity, not from any indefinite or implied grant of power, but from one clearly expressed in the Constitution itself (article 1, § 8, cl. 18): 'To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof.' This is the power preservative of all others, and essential for adding vitality to the framework of the government. Among the primary powers to be carried into effect is the power to legislate through a Congress consisting of a Senate and House of Representatives chosen by the people—in short, the power to maintain a law-making body representative in its character. Another is the specific power to regulate the 'manner of holding elections for Senators and Representatives,' conferred by section 4 of the first article; and if this does not in literal terms extend to nominating proceedings intimately related to the election itself, it certainly does not in terms or by implication exclude federal control of those proceedings. From a grant to the states of power to regulate the principal matter, expressly made subject to revision and alteration by the Congress, it is impossible to imply a grant to the states of regulatory authority over accessory matters exclusive of the Congress. And it is obvious that if clause 18 adds nothing to the content of the other express powers, when these are literally interpreted, it has no efficacy whatever and must be treated as surplusage. It has not, heretofore, been so regarded. The subject was exhaustively treated by Chief Justice Marshall, speaking for the court in the great case already referred to, McCulloch v. Maryland, 4 Wheat. 316, 411–424, where he pointed out, pp. 419, 420,

4 L. Ed. 579: '1st. The clause is placed among the powers of Congress, not among the limitations on those powers. 2d. Its terms purport to enlarge, not to diminish the powers vested in the government. It purports to be an additional power, not a restriction on those already granted.' According to the conclusive reasoning adopted in that case, whatever meaning may be attributed to section 4 of article 1, there is added by clause 18 of section 8 everything necessary or proper for carrying it into execution—which means, into practical and complete effect."

Chief Justice White also disagreed with the views of the four judges, and said: "Under these conditions I find it impossible to say that the admitted power of Congress to control and regulate the election of Senators does not embrace, as appropriate to that power, the authority to regulate the primary held under state authority." Justice McKenna concurred in the opinion of the four judges, as applied to the statute in question, as enacted prior to the adoption of the Seventeenth Amendment, but reserved his opinion as to the power of Congress, after the adoption of that amendment.

In view of the decision in the Newberry Case, the defendant in this case contends that Congress could enact no valid legislation, as to which the testimony given by the defendant could be of any assistance. Section 4 of article 1 of the United States Constitution authorizes Congress to make or alter regulations as to the times and manner of holding elections for Senators and Representatives in Congress. The decision in the Newberry Case dealt with a specific statute, which directly undertook the regulation of primary elections where United States Senators were nominated for election. The inquiry in this case has a much broader scope. The usual manner of holding elections for United States Senators and Representatives in recent years in the United States has been by the use of written or printed ballots, cast by qualified voters at a designated time, and before qualified election officers. Since the adoption of the system known as the Australian ballot law, it has been provided by statutes that the only manner in which an election could be conducted in many of the states for the election of a Senator or Representative has been by the use of a printed official ballot, furnished to the voters by public officers, and that upon such ballots no names of nominees for Representative or Senator could be printed, unless such nominees had been regularly chosen, as provided

by other statutes, at a primary election preceding the general election. See Corp. Jur. 140, 141. It has further been a part of the manner of holding such general elections in many states that the names of those who have been otherwise regularly nominated for public office could not be printed upon the ballots to be used by the voters at the general election unless such nominees should first file a sworn statement of the amount of money which had been received and expended by such nominees in procuring their nominations. Other statutes require similar statements as to money contributed to or disbursed by any campaign committee or others acting on behalf of such nominee. The provisions of some statutes of this nature may be found in the following decisions, where they have been cited and applied: State v. Board of Ballot Com'rs, 82 W. Va. 752, 97 S. E. 284; State v. Patterson, 67 Fla. 499, 65 So. 659; Hays v. Combs, 177 Ky. 355, 197 S. W. 788; State ex rel. Maxson v. Brodigan, 37 Nev. 488, 143 P. 306; State v. Walker, 122 Okl. 95, 251 P. 497.

In Ex parte Siebold, 100 U. S. 371, 383, 386, 388, 393, 25 L. Ed. 717, the court said:

"The clause of the Constitution under which the power of Congress, as well as that of the State legislatures, to regulate the election of senators and representatives arises, is as follows: 'The times, places, and manner of holding elections for senators and representatives shall be prescribed in each State by the legislature thereof; but the Congress may at any time, by law, make or alter such regulations, except as to the place of choosing Senators.'

"It seems to us that the natural sense of these words is the contrary of that assumed by the counsel of the petitioners. After first authorizing the States to prescribe the regulations, it is added, 'The Congress may at any time, by law, make or alter such regulations.' 'Make or alter:' What is the plain meaning of these words? If not under the prepossession of some abstract theory of the relations between the State and national governments, we should not have any difficulty in understanding them. There is no declaration that the regulations shall be made either wholly by the State legislatures or wholly by Congress. If Congress does not interfere, of course they may be made wholly by the State; but if it chooses to interfere, there is nothing in the words to prevent its doing so, either wholly or partially. On the contrary, their necessary implication is that it may do either. * * *

"So in the case of laws for regulating the elections of representatives to Congress. The State may make regulations on the subject, Congress may make regulations on the same subject, or may alter or add to those already made. The paramount character of those made by Congress has the effect to supersede those made by the State, so far as the two are inconsistent, and no farther. * * *

"It is the duty of the States to elect representatives to Congress. The due and fair election of these representatives is of vital importance to the United States. The government of the United States is no less concerned in the transaction than the State government is. It certainly is not bound to stand by as a passive spectator, when duties are violated and outrageous frauds are committed. It is directly interested in the faithful performance, by the officers of election, of their respective duties. Those duties are owed as well to the United States as to the State. This necessarily follows from the mixed character of the transaction—State and national. A violation of duty is an offence against the United States, for which the offender is justly amenable to that government."

See, also, Ex parte Clarke, 100 U. S. 399, 25 L. Ed. 715; United States v. Gale, 109 U. S. 65, 3 S. Ct. 1, 27 L. Ed. 857; Ex parte Yarbrough, 110 U. S. 651, 4 S. Ct. 152, 28 L. Ed. 274; In re Coy, 127 U. S. 731, 8 S. Ct. 1263, 32 L. Ed. 274.

Congress at different times has exerted the power of controlling the manner of holding elections for members of Congress. In the case of Ex parte Siebold, the court was considering the provisions of sections 2011, 2012, 2016, 2017, 2021, 2022, 5515, and 5522 of the Revised Statutes of the United States providing for federal supervisors of elections and the duties imposed upon them and upon officers of elections and forbidding interferences with such elections. Other acts of Congress have provided for the election of representatives by districts, and that election should be by ballot, or by voting machine. See 2 U. S. Code, §§ 3, 7, 9 [2 USCA §§ 3, 7, 9].

In view of these decisions, it is not perceived why Congress may not enact valid legislation providing that the manner of elections for Senators and Representatives shall be by the use of a printed official ballot; that upon such ballot there shall be printed the names of those nominees only for such offices as shall have duly made and filed with some public officer a sworn statement of all

contributions and expenditures which have been made by or for the benefit of such candidate, to his knowledge, in obtaining the nomination for such office, and the names of those contributing and of those to whom money was paid; also requiring as a prerequisite to the printing of such nominee's name upon the ballot that the officers of a campaign committee acting on behalf of such candidate should file a similar statement. As has been indicated, such legislation would be in harmony with the legislation of many states and with other statutory restrictions as to names of candidates upon the printed ballots. See 9 Rul. Cas. Law, pages 1054, 1055, 1056. It would relate directly to the manner of holding the elections for Senators and Representatives. As an aid to the advisability and to the scope of such legislation, the testimony of the defendant in this case as to contributions alleged to have been made by W. M. Stebbins as an alleged candidate for nomination for United States Senator, and to alleged agents of George W. Norris of Broken Bow, Neb., as an alleged candidate for nomination, for United States Senator, was pertinent to the inquiry which was directed to be made by the resolution of the United States Senate. It would be difficult to say that such testimony was pertinent to no other possible legislation that Congress could enact, and it is not necessary to assert such a sweeping negative. In view of the conclusion reached, it is not necessary to consider whether the inquiry directed by the resolution was authorized by clause one of section 5 of article 1 of the Constitution, as an investigation of the qualifications of candidates, one of whom might thereafter become a member elect of the Senate.

Some other objections have been urged to the indictment, which relate to the form of the allegations in the indictment. There is no direct allegation that Gerald P. Nye was ever elected or chosen as the chairman of the Senate committee, but there are allegations such as "Gerald P. Nye who was the Chairman of said Special Committee"; "Gerald P. Nye, the chairman of said Special Committee;" "Gerald P. Nye, United States Senator and a member and chairman of said Special Committee." In Markham v. United States, 160 U. S. 319, 323, 16 S. Ct. 288, 290, 40 L. Ed. 441, an indictment for perjury was challenged, and in that case the court said, after referring to the laws relating to pension examiners: "In view of these enactments, the averment that the oath, charged to have been willfully and corruptly taken

was taken 'before G. C. Loomis, then and there a special examiner of the pension bureau of the United States, and then and there a competent officer and having lawful authority to administer said oath,' was sufficient, in connection with the statute, to inform the accused of the official character and authority of the officer before whom the oath was taken."

Under the authority of this case, the description of Gerald P. Nye in the pending indictment as chairman of the special committee would seem to be a sufficient allegation that he was such chairman.

It is also claimed that there is no sufficient allegation that there were any candidates for United States Senator at the time of the giving of this testimony. The Senate resolution directed an investigation of the contributions to and the campaign expenditures of the candidates for the United States Senate. This resolution was adopted on April 10, 1930, and this testimony was given on July 21, 1930.

The portion of the indictment, which has been quoted, alleges that there had been filed in the office of the secretary of state of Nebraska, on behalf of George W. Norris of Broken Bow, Neb., an application requesting that his name be placed on the official ballot of the Republican Party for the primary election to be held on August 12, 1930, as a candidate for United States Senator; this application is alleged to have been filed "prior to the aforesaid primary election," but no date is alleged for this filing. It has been held that the portion of the Nebraska statutes (Comp. Stats. 1929, 32-1124) which reads as follows: "The name of no candidate shall be printed upon an official primary ballot unless at least forty days prior to such primary, either he, or twenty-five qualified electors of the party with which said candidate affiliates shall have filed a written application with the proper authority and in substantially the following form," is mandatory in the requirement that the filing be made at least forty days prior to the primary election. State v. Marsh (Neb.) 232 N. W. 99; State v. Marsh (Neb.) 232 N. W. 103.

The indictment also alleges that a statement in writing had been filed by W. M. Stebbins of Gothenburg, Neb., as provided by law, accepting a written application filed by sufficient voters of Nebraska, requesting that W. M. Stebbins' name be placed upon the official primary ballot of the Republican

Party for the primary election to be held August 12, 1930, as a candidate for the office of United States Senator. The indictment also alleges that this acceptance was filed prior to the primary election, but alleges no date for the filing, either of the application or acceptance. If the fact of the candidacy of the two men mentioned depended upon these allegations, the indictment would be defective, because of failure to state sufficient facts showing a substantial compliance with the Nebraska statutes requisite to obtaining a place upon the printed official ballot for candidates at a primary election. The Senate resolution did not limit the investigation of its committee to candidates who were entitled to have their names printed upon official ballots at primary elections for nomination for the office of United States Senator, but referred to candidates in the broad sense of that term. Under the laws regulating primary elections in Nebraska, as well as under its laws regulating general elections, one may be a candidate, for United States Senator, capable of receiving votes, and of being chosen, although his name is not printed upon the ballot. The facts alleged in the indictment show the assertion of a candidacy in fact of each of the two men mentioned, for nomination for the office of United States Senator before the date of the primary election, and, if the alleged facts were true, either could have been legally nominated and elected as United States Senator from Nebraska, whether or not he was entitled to have his name printed upon the official ballot.

■■ In an indictment for perjury, it must appear on the face of the indictment that the statements alleged to have been falsely sworn to by the defendant were material to the matter in issue. This materiality may be directly alleged, or it is sufficient if the facts alleged are such as show that the statements were material as a matter of law. Markham v. United States, 160 U. S. 319, 325, 16 S. Ct. 288, 40 L. Ed. 441.

In an indictment for perjury, it is usual to allege directly in the charging part that the testimony alleged to have been given was material to the matter under inquiry, and such was the allegation in Markham v. United States. See 2 Bishop Crim. Proc., § 921.

■■ In each count of the indictment it is alleged that the questions asked of the defendant were material to the matters under inquiry, but there is no allegation that the answers or testimony given by the defendant were material to the matters under inquiry except that, in the concluding part of each count, it is alleged, in substance, as follows: "And so the grand jurors aforesaid, upon their oaths aforesaid, do present, that he, the said Victor Seymour * * *" did "testify and declare and state material matters as aforesaid." This allegation does not allege what statements of the defendant were material. It does not allege that all of the statements, or that each of them, was material, or that any definite one of them was material, or that any definite part was material. The allegations in the concluding part of each count therefore fall under the condemnation of the rule stated in Pettibone v. United States, 148 U. S. 197, 202, 13 S. Ct. 542, 545, 37 L. Ed. 419: "The general rule in reference to an indictment is that all the material facts and circumstances embraced in the definition of the offense must be stated, and that, if any essential element of the crime is omitted, such omission cannot be supplied by intendment or implication. The charge must be made directly, and not inferentially, or by way of recital."

If the allegation in the concluding portion of the counts may be regarded as a direct charge of materiality, then such allegations fail to inform the defendant of the definite portions of his testimony which were material to the inquiry. United States v. Cruikshank, 92 U. S. 542, 558, 23 L. Ed. 588; United States v. Simmons, 96 U. S. 360, 362, 24 L. Ed. 819; United States v. Hess, 124 U. S. 483, 487, 8 S. Ct. 571, 31 L. Ed. 516; State v. Crocker, 106 Me. 369, 76 A. 703; Weinstein v. State, 146 Md. 80, 125 A. 889.

Because of the defect in failing to allege what specific portions of the defendant's testimony were material to the inquiry, an order will be entered sustaining the demurrer of the defendant to each count of the indictment.