UNITED STATES *v.* GRADWELL ET AL.

UNITED STATES *v.* HAMBLY ET AL.

ERROR TO THE DISTRICT COURT OF THE UNITED STATES FOR
THE DISTRICT OF RHODE ISLAND.

. UNITED STATES *v.* O'TOOLE ET AL.

UNITED STATES *v.* O'TOOLE ET AL.

ERROR TO THE DISTRICT COURT OF THE UNITED STATES FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA. ·

Nos. 683, 684, 775, 776.   Argued March 16, 1917.—Decided April 9, 1917.

A conspiracy to influence a congressional election by bribery of voters
is not a conspiracy to defraud the United States within the meaning
of § 37 of the Penal Code, formerly § 5440 of the Revised Statutes.

*Quære:* Whether the power of Congress to regulate elections of Senators
and Representatives, Const., Art. I, § 4, is applicable to a general
nominating primary as distinguished from a final election? ˙

The primary election law of West Virginia, Acts 1915, c. 26, pp. 222,
246, provides that only candidates belonging to a political party
which polled three per cent. of the vote of the State at the last pre-
ceding general election can be voted for, excludes independent and·
other voters not regular. and qualified members and voters of such a
party from participation in the primary, and further provides that,
after the primary, candidates, including persons who have failed
therein, may be nominated by certificate signed by not less than
five per cent. of the entire vote of the last preceding election. *Held*,
That the rights which candidates for nomination for the office of
Senator of the United States may have in such a primary come
wholly from the state law; and a conspiracy to deprive them of such
rights by debauching the primary with illegal votes for an opposing
candidate is·not within the scope of § 19 of the Penal Code (formerly
Rev. Stats., § 5508) designed for the protection of rights and privi-
leges. secured by the Constitution or laws of the United States.

The Federal Corrupt Practices Act, and amendments (c. 392, 36 Stat. 822; c. 33, 37 Stat. 25; c. 349, 37 Stat. 360), recognizing primary elections and limiting the expenditures of candidates for Senator in connection with them, are not in effect an adoption of all state primary laws as acts of Congress.

The temporary measure enacted by Congress for the conduct of the nomination and election of Senators until other provision should be made by state legislation (c. 103, 38 Stat. 384) was superseded as to West Virginia by the primary law of that State of February 20, 1914, effective ninety days after its passage.

234 Fed. Rep. 446; 236 Fed. Rep. 993, affirmed.

THE cases are stated in the opinion.

*Mr. Assistant Attorney General Wallace* for the United States.

*Mr. Alexander L. Churchill* for defendants in error in Nos. 683 and 684.

*Mr. John W. Cummings,* with whom *Mr. James T. Cummings* and *Mr. John J. Fitzgerald* were on the brief, for defendant in error Flynn, in No. 684.

*Mr. John H. Holt,* with whom *Mr. Luther C. Anderson* was on the brief, for defendants in error in Nos. 775 and 776.

MR. JUSTICE CLARKE delivered the opinion of the court.

These four cases were argued together because the indictments in the first three must be justified, if at all, under the same section (§ 37) of the Criminal Code of the United States, while the fourth involves the application of § 19 of that Code to the same state of facts which we have in the third case.

In the Gradwell case (No. 683) and in the Hambly case (No. 684) the fourteen defendants are charged in the in-

dictments with having conspired together "to defraud the United States," and to commit a wilful fraud upon the laws of the State of Rhode Island, by corrupting and debauching, by bribery of voters, the general election held on the third of November, 1914, at which a Representative in Congress was voted for and elected in the Second Congressional District of Rhode Island in the Gradwell case, and in the First Congressional District in the Hambly case, thereby preventing "a fair and clean" election.

No. 775 relates to the conduct of a primary election held in the State of West Virginia on the sixth of June, 1916, under a law of that State providing for a state wide nomination of candidates for the United States Senate. In the indictment twenty defendants are charged with conspiring "to defraud the United States in the matter of its governmental right to have the candidates of the true choice and preference of said Republican and Democratic parties nominated for said office, and one of them elected," by causing and procuring a large number of persons who had not resided in the State a sufficient length of time to entitle them to vote under the state law, to vote at the primary for a candidate named, and also to procure four hundred of such persons to vote more than once at such primary election.

The indictment in No. 776 charges that the same defendants named in No. 775 conspired together to "*injure and oppress*" White, Sutherland and Rosenbloom, three candidates for the Republican nomination for United States Senator who were voted for at the primary election held in West Virginia on June 6th, 1916, under a law of that State, by depriving them of the "right and privilege of having each Republican voter vote once only, for some one" of the Republican candidates for such nomination, and of not having any votes counted at such election except such as were cast by Republican voters duly qualified

under the West Virginia law. The charge is that the defendants conspired to accomplish this result by procuring a thousand persons, who were not qualified to vote under the state law, because they had not resided in that State a sufficient length of time, to vote for an opposing candidate, William F. Hite, and many of them to vote more than once, and to have their votes cast, counted and returned as cast in favor of such candidate.

A demurrer to the indictment by each of the defendants in each case, on the ground that it fails to set forth any offense under the laws of the United States, was sustained by the District Court of the District of Rhode Island in the first two cases and of the Southern District of West Virginia in the third and fourth. The cases are here on error.

It is plain from the foregoing statement that the indictments in the first three cases are based solely upon the charge that the defendants conspired "to defraud the United States" in violation of § 37 of the Criminal Code, and that the indictment in No. 776 is based upon the charge that three candidates for the nomination for Senator of the United States were "injured and oppressed" within the meaning of § 19 of the Criminal Code, by a conspiracy on the part of the defendants to compass their defeat by causing illegal voting for an opposing party candidate at the primary election.

The applicable portions of §§ 37 and 19 are as follows:

"Section 37. If two or more persons conspire either to commit any offense against the United States, or to defraud the United States in any manner or for any purpose, . . . each of the parties to such conspiracy shall be fined not more than ten thousand dollars, or imprisoned not more than two years, or both."

"Section 19. If two or more persons conspire to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to

him by the Constitution or laws of the United States, or because of his having so exercised the same, . . . they shall be fined not more than five thousand dollars and imprisoned not more than ten years, and shall, moreover, be thereafter ineligible to any office, or place of honor, profit, or trust created by the Constitution or laws of the United States."

The argument of counsel for plaintiff in error in the first three cases is that the United States Government has the right to honest, free and fair elections, that a conspiracy to corrupt electors by bribery has for its object the denial and defeat of this right and that it therefore is a scheme to defraud the United States within the meaning of § 37. This presents for decision the questions:

Is § 37 of the Criminal Code applicable to congressional elections, and if it is, has the United States such an interest or right in the result of such elections that to bribe electors constitutes a fraud upon the Government within the meaning of this section?

To admit, as it must be admitted, that the people of the United States and so their Government, considered as a political entity, have an interest in and a right to honest and fair elections advances us but little toward determining whether § 37 was enacted to protect that right and whether a conspiracy to bribe voters is a violation of it. Obviously the Government may have this right and yet not have enacted this law to protect it. It may be, as is claimed, that Congress intended to rely upon state laws and the administration of them by state officials to secure honest elections, and that this section was enacted for purposes wholly apart from those here claimed for it.

To answer the questions presented requires that we look to the origin and history of § 37, and that we consider what has been, and is now, the policy of Congress in dealing with the regulation of elections of Representatives in Congress.

Section 37 first appears as § 30 of "An Act to amend existing laws relating to Internal Revenue, and for other purposes," enacted on March 2, 1867, 14 Stat. 471, and, except for an omitted not relevant provision, the section has continued from that time to this, in almost precisely its present form. It was carried into the revision of the United States Statutes of 1873–4 as § 5440 of Chapter 5, the title of which is "Crimes against the Operations of the Government," while another chapter, Chapter 7 of the revision, deals with "Crimes against the Elective Franchise and Civil Rights of Citizens." Forty-two years after its first enactment the section was carried into the Criminal Code (in force on and after January 1st, 1910) where it now appears as § 37, again in a chapter, now Chapter 4, devoted to "Offenses against the Operations of the Government," while Chapter 3 of the Code deals with "Offenses against the Elective Franchise and Civil Rights of Citizens."

The section has been widely applied in the prosecution of frauds upon the revenue, in land cases and to other operations of the Government, and, while no inference or presumption of legislative construction is to be drawn from the chapter headings under which it is found in the Criminal Code (§ 339), nevertheless the history of the origin, classification and use made of the section, which we have just detailed, are not without significance, and taken with the fact that confessedly this is the first time that it has been attempted to extend its application to the conduct of elections, they suggest strongly that it was not intended by Congress for such a purpose.

Further aid in determining the application and construction of the section may be derived from the history of the conduct and policy of the Government in dealing with congressional elections.

The power of Congress to deal with the election of Senators and Representatives is derived from § 4, Article 1

of the Constitution of the United States, providing
that:

"The times, places and manner of holding elections for
Senators and Representatives, shall be prescribed in each
State by the Legislature thereof; but the Congress may at
any time by law make or alter such regulations, except
as to the places of choosing Senators."

Whatever doubt may at one time have existed as to the
extent of the power which Congress may exercise under
this constitutional sanction in the prescribing of regu-
lations for the conduct of elections for Representatives in
Congress or in adopting regulations which States have
prescribed for that purpose has been settled by repeated
decisions of this court, in *Ex parte Siebold*, 100 U. S. 371,
391 (1879); *Ex parte Clarke*, 100 U. S. 399 (1879); *Ex
parte Yarbrough*, 110 U. S. 651 (1884); and in *United
States* v. *Mosley*, 238 U. S. 383 (1915).

Although Congress has had this power of regulating
the conduct of congressional elections from the organiza-
tion of the Government, our legislative history upon the
subject shows that, except for about twenty-four of the
one hundred and twenty-eight years since the Govern-
ment was organized, it has been its policy to leave such
regulations almost entirely to the States, whose repre-
sentatives Congressmen are. For more than 50 years no
congressional action whatever was taken on the subject
until 1842 when a law was enacted requiring that Repre-
sentatives be elected by Districts (5 Stat. 491), thus doing
away with the practice which had prevailed in some
States of electing on a single state ticket all of the Mem-
bers of Congress to which the State was entitled.

Then followed twenty-four years more before further
action was taken on the subject when Congress provided
for the time and mode of electing United States Senators
(14 Stat. 243) and it was not until four years later, in 1870,
that, for the first time, a comprehensive system for dealing

with congressional elections was enacted. This system was comprised in §§ 19, 20, 21 and 22 of the Act approved May 31, 1870, 16 Stat. 144; in §§ 5 and 6 of the Act approved July 14, 1870, 16 Stat. 254; and in the Act amending and supplementing these acts, approved June 10, 1872, 17 Stat. 347, 348, 349.

These laws provided extensive regulations for the conduct of congressional elections. They made unlawful, false registration, bribery, voting without legal right, making false returns of votes cast, interfering in any manner with officers of election and the neglect by any such officer of any duty required of him by state or federal law; they provided for appointment by Circuit Judges of the United States of persons to attend at places of registration and at elections, with authority to challenge any person proposing to register or vote unlawfully, to witness the counting of votes and to identify by their signatures the registration of voters and election tally sheets; and they made it lawful for the marshals of the United States to appoint special deputies to preserve order at such elections, with authority to arrest for any breach of the peace committed in their view.

These laws were carried into the revision of the United States Statutes of 1873–4, under the title "Crimes against the Elective Franchise and Civil Rights of Citizens," Rev. Stats., §§ 5506 to 5532, inclusive.

It will be seen from this statement of the important features of these enactments that Congress by them committed to federal officers a very full participation in the process of the election of Congressmen, from the registration of voters to the final certifying of the results, and that the control thus established over such elections was comprehensive and complete. It is a matter of general as of legal history that Congress, after twenty-four years of experience, returned to its former attitude toward such elections and repealed all of these laws with the exception

of a few sections not relevant here. Act approved February 8, 1894, 28 Stat. 36. This repealing act left in effect as apparently relating to the elective franchise, only the provisions contained in the eight sections of Chapter 3 of the Criminal Code, §§ 19 to 26, inclusive, which have not been added to or substantially modified during the twenty-three years which have since elapsed.

The policy of thus entrusting the conduct of elections to state laws, administered by state officers, which has prevailed from the foundation of the Government to our day, with the exception, as we have seen, of twenty-four years, was proposed by the makers of the Constitution and was entered upon advisedly by the people who adopted it, as clearly appears from the reply of Madison to Monroe in the debates in the Virginia Convention, saying that:

"It was found impossible to fix the time, place, and manner, of election of representatives in the constitution. It was found necessary to leave the regulation of these, in the first place, to the state governments, as being best acquainted with the situation of the people, subject to the control of the general government, in order to enable it to produce uniformity, and prevent its own dissolution. . . . Were they exclusively under the control of the state governments, the general government might easily be dissolved. But if they be regulated properly by the state legislatures, the congressional control will very probably never be exercised. The power appears to me satisfactory, and as unlikely to be abused as any part of the constitution." Records of the Federal Convention, Farrand, vol. 3, p. 311.

And, in Essay No. LIX of the Federalist, Hamilton writes:

"They [the convention] have submitted the regulation of elections for the federal government, in the first instance, to the local administrations; which, in ordinary

cases, and when no improper views prevail, may be both more convenient and more satisfactory; but they have reserved to the national authority a right to interpose, whenever extraordinary circumstances might render that interposition necessary to its safety."

With it thus clearly established that the policy of Congress for so great a part of our constitutional life has been, and now is, to leave the conduct of the election of its members to state laws, administered by state officers, and that whenever it has assumed to regulate such elections it has done so by positive and clear statutes, such as were enacted in 1870, it would be a strained and unreasonable construction to apply to such elections this § 37, originally a law for the protection of the revenue and for now fifty years confined in its application to "Offenses against the Operations of the Government" as distinguished from the processes by which men are selected to conduct such operations.

When to all this we add that there are no common-law offenses against the United States (*United States* v. *Hudson,* 7 Cranch, 32; *United States* v. *Eaton,* 144 U. S. 677), that before a man can be punished as a criminal under the federal law his case must be "plainly and unmistakably" within the provisions of some statute (*United States* v. *Lacher,* 134 U. S. 624, 628), and that Congress has always under its control the means of defeating frauds in the election of its members by enacting appropriate legislation and by resort to the constitutional grant of power to judge of the elections, returns and qualifications of its own members, we cannot doubt that the District Court was right in holding that the section was never intended to apply to elections, and that to bribe voters to vote at such an election is not such a fraud upon the United States or upon candidates or the laws of Rhode Island as falls within either the terms or purposes of the section.

There remains to be considered the second West Vir-

ginia case, No. 776. The indictment in this case charges.
that the defendants conspired to procure and did procure
a large number of persons, not legal voters of West Vir-
ginia to vote, and a number of them to vote more than
once, in favor of one of the four candidates for the Repub-
lican nomination for United States Senator at a state
primary. The claim is that such illegal voting "injured
and oppressed" the three other party candidates, within
the meaning of § 19 of the Criminal Code of the United
States, by depriving them of a right, which it is argued
they had "by the Constitution and laws of the United
States," to have only qualified Republican voters of the
state vote, not more than once for some one of the candi-
dates of that party for Senator at such election.

Here again, confessedly, an attempt is being made to
make a new application of an old law to an old type of
crime, for § 19 has been in force, in substance, since 1870,
but has never before been resorted to as applicable to the
punishment of offenses committed in the conduct of pri-
mary elections or nominating caucuses or conventions, and
the question presented for decision is:

Did the candidates named in the indictment have such
a right under the applicable West Virginia law that a
conspiracy to corrupt the primary election held under that
law on the sixth day of last June "injured and oppressed"
them within the meaning of § 19 of the Federal Criminal
Code?

That this § 19 of the Criminal Code is applicable to
certain conspiracies against the elective franchise is de-
cided by this court in *United States* v. *Mosley*, 238 U. S.
383, but that decision falls far short of making the section
applicable to the conduct of a state nominating primary,
and does not advance us far toward the claimed con-
clusion that illegal voting for one candidate at such a
primary so violates a right secured to the other candidates
by the United States Constitution and laws as to consti-

tute an offense within the meaning and purpose of the section.

The constitutional warrant under which regulations relating to congressional elections may be provided by Congress is in terms applicable to the "times, places and manner of holding elections [not nominating primaries] for Senators and Representatives." Primary elections, such as it is claimed the defendants corrupted, were not only unknown when the Constitution was adopted but they were equally unknown for many years after the law, now § 19, was first enacted. They are a development of comparatively recent years, designed to take the place of the nominating caucus or convention, as these existed before the change, and even yet the new system must be considered in an experimental stage of development, under a variety of state laws.

The claim that such a nominating primary, as distinguished from a final election, is included within the provision of the Constitution of the United States applicable to the election of Senators and Representatives is by no means indisputable. Many state supreme courts have held that similar provisions of state constitutions relating to elections do not include a nominating primary. *Ledgerwood* v. *Pitts*, 122 Tennessee, 570; *Montgomery* v. *Chelf*, 118 Kentucky, 766; *State ex rel. Von Stade* v. *Taylor*, 220 Missouri, 619; *State* v. *Nichols*, 50 Washington, 508; *Gray* v. *Seitz*, 162 Indiana, 1; *State* v. *Erickson*, 119 Minnesota, 152.

But even if it be admitted that in general a primary should be treated as an election within the meaning of the Constitution, which we need not and do not decide, such admission would not be of value in determining the case before us, because of some strikingly unusual features of the West Virginia law under which the primary was held out of which this prosecution grows. By its terms this law provided that only candidates for Congress belonging

to a political party which polled three per cent. of the vote
of the entire State at the last preceding general election
could be voted for at this primary, and thereby, it is said
at the bar, only Democratic and Republican candidates
could be and were voted for, while candidates of the Pro-
hibition and Socialist parties were excluded, as were also
independent voters who declined to make oath that they
were "regular and qualified members and voters" of one
of the greater parties. Even more notable is the provision
of the law that after the nominating primary, candidates,
even persons who have failed at the primary, may be
nominated by certificate signed by not less than five per
cent. of the entire vote polled at the last preceding election.
Acts West Virginia, 1915, c. 26, pp. 222, 246.

Such provisions as these, adapted though they may be
to the selection of party candidates for office, obviously
could not be lawfully applied to a final election at which
officers are chosen, and it cannot reasonably be said that
rights which candidates for the nomination for Senator
of the United States may have in such a primary under
such a law are derived from the Constitution and laws of
the United States. They are derived wholly from the state
law and nothing of the kind can be found in any federal
statute. Even when Congress assumed, as we have seen,
to provide an elaborate system of supervision over con-
gressional elections no action was taken looking to the
regulation of nominating caucuses or conventions, which
were the nominating agencies in use at the time such laws
were enacted.

What power Congress would have to make regulations
for nominating primaries or to alter such regulations
when made by a State we need not inquire. It is sufficient
to say that as yet it has shown no disposition to assume
control of such primaries or to participate in them in any
way, and that it is not for the courts, in the absence of
such legislation, to attempt to supply it by stretching old

statutes to new uses, to which they are not adapted and for which they were not intended. In this case, as in the others, we conclude that the section of the Criminal Code relied upon, originally enacted for the protection of the civil rights of the then lately enfranchised negro, cannot be extended so as to make it an agency for enforcing a state primary law, such as this one of West Virginia.

The claim that the Federal Corrupt Practices Act (June 25, 1910, c. 392, 36 Stat. 822, amended August 19, 1911, c. 33, 37 Stat. 25, and August 23, 1912, c. 349, 37 Stat. 360), recognizing primary elections and limiting the expenditures of candidates for Senator in connection with them is, in effect, an adoption by Congress of all state primary laws is too unsubstantial for discussion; and the like claim that the temporary measure (Act of June 4, 1914, 38 Stat. 384), enacted by Congress for the conduct of the nomination and election of Senators until other provision should be made by state legislation, cannot be entertained, because this act was superseded by the West Virginia primary election law, passed February 20th, 1914, effective ninety days after its passage.

It results that the judgments of the District Court in each of these cases must be

*Affirmed.*