MERRITT, Circuit Judge,
dissenting.
My view in this case of first impression in this Circuit is that the sentencing of this nonviolent, 30-year-old petty drug trafficker to life imprisonment by using a juvenile conviction as a necessary third strike not only violates clear congressional intent revealed by clear rules of statutory construction but also violates sound principles of penological policy based on the Eighth Amendment values recently outlined by the Supreme Court in Graham v. Florida, — U.S.-, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010). I would have preferred that my colleagues in the majority acknowledge and address the arguments made here against the use of a juvenile conviction to send this nonviolent drug offender to prison for life. Instead they have chosen to ignore those arguments. I leave it to the readers to determine for themselves the usefulness and credibility of this kind of appellate decision making.
Three canons of statutory construction apply here. It is a well settled canon of statutory construction that when interpreting statutes, “[t]he language of the statute is the starting point for interpretation, and it should also be the ending point if the plain meaning of that language is clear.” United States v. Choice, 201 F.3d 837, 840 (6th Cir.2000) (citing United States v. Ron Pair Enters., Inc., 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989)). With respect to the question presented here, I find the statutory language to be unambiguous. The plain language of the statute used to imprison Graham for life simply does not mention using juvenile convictions as predicate “prior felonies,” and we should not read such an interpretation into the statute. There is no indication; and, as will be demonstrated below, the indication is to the contrary, that Congress intended to endorse the use of juvenile convictions in this statute to enhance a defendant’s sentence.
1. In pari materia
In this case we are interpreting one statute with two immediately adjacent sections that enhance the punishment for two separate federal crimes. The first section amends the “career criminal” statute dealing with violent felonies, 18 U.S.C. § 924(e), and it says expressly that the punishment for violent, career criminal conduct must be increased by using convictions for juvenile conduct. The second section amends the drug law, 21 U.S.C. § 841(b)(1)(A); and, contrary to the first section, this section says only that the punishment must be increased to life imprisonment for three or more “convictions.” Unlike the career criminal section immediately above it, the drug enhancement section does not specify the use of juvenile convictions.[1] Courts in three cir *466 cuits have recognized the pari materia principle as an appropriate method of interpreting these two provisions in the statute distinguishing between the use of prior juvenile convictions. United States v. Huggins, 467 F.3d 359, 361 & n. 2 (3d Cir.2006); United States v. Peyton, 716 F.Supp.2d 1 (D.D.C.2010); United States v. Ivory, No. 04-20044-01-KHV, 2010 WL 1816236, at *3 & n. 3 (D.Kan. Feb.26, 2010).
Statutes are considered to be in pari materia when they relate to the same person or thing, to the same class of persons or things, or have the same purpose or object. Each section of a law which deals with the same subject matter must be read in pari materia with other sections on the same subject. Norman J. Singer, 2A Statutes and Statutory Construction § 51.3 (2000 ed.). Obviously, language is in pari materia when in the very same statute in paragraphs placed next to each other. In view of Congress’ failure to include in § 841 a definition of “prior conviction” that specifically includes convictions obtained when the defendant was a juvenile, I would rely on the canon of statutory construction that states: “[I]t is generally presumed that Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another.” Chicago v. Envtl. Def. Fund, 511 U.S. 328, 338, 114 S.Ct. 1588, 128 L.Ed.2d 302 (1994) (quoting Keene Corp. v. United States, 508 U.S. 200, 208, 113 S.Ct. 2035, 124 L.Ed.2d 118 (1993)); see also Norman J. Singer, 3B Statutes and Statutory Construction § 75.4 (2000 ed.). This distinction between two statutory amendments passed at the same time in adjacent sections shows that Congress knew how to include a juvenile conviction when it wanted to. See Pub.L. No. 100-690, § 6451, 102 Stat. 4181, 4371 (1988).
My position is simply that the two adjacent sections of the same statute invoke an ancient, sensible, common law canon of statutory construction and must be read in pari materia.[2] Thus by specifically including juvenile convictions in the first enhancement for violent career criminals but leaving it out in the next section dealing with drugs, the statutory drafters did not intend to allow juvenile conduct resulting in a conviction to be used to enhance the punishment to life imprisonment, as my colleagues insist. I think the pari materia canon is clear and leads to a clear result of no increased penalty based on juvenile conduct.
Upon a moment’s reflection, the reason Congress chose to treat juvenile convictions differently in the statute becomes obvious. Congress made the distinction because a pattern of violent conduct involving the use of force is more culpable *467 than a pattern of nonviolent sales of drugs that may be, as here, relatively minor in nature. The recent Supreme Court case of Johnson v. United States, — U.S. -, 130 S.Ct. 1265, 176 L.Ed.2d 1 (2010), reinforces this view by making it clear that the conduct underlying the recidivist enhancements of the career criminal provision must be violent and involve the use of significant force rather than a mild form of battery. That is the “context” of the two different adjacent provisions — the one including juvenile convictions, the other excluding them — and as the Johnson case states quite logically, in statutory construction, “ultimately, context determines meaning....” Id. at 1270 (citing Jarecki v. G.D. Searle & Co., 367 U.S. 303, 307, 81 S.Ct. 1579, 6 L.Ed.2d 859 (1961)). If so, the “context” of the two different adjacent penalties means that juvenile convictions should not be used to enhance penalties under the drug statute.
“Context” is also the reason that a few cases have allowed the use of juvenile convictions in drug cases. In these cases, the court was not informed of the fact that the enacting statute contained, side by side, the two different penalty provisions. Counsel for the defendant did not inform the courts of this crucial fact, and the Department of Justice did not disclose it either. Perhaps we should not be too critical of the courts for not discovering the context because the federal criminal law has become exceedingly complex and convoluted during the last forty years. But once a court discovers the context, I do not see how it can simply reject the application of the pari materia rule.
My colleagues deal with this issue of interpretation indecisively and in a puzzling way. They simply say that the issue arises because the two contrary juvenile conviction provisions are “interestingly enough in consecutive sections § 6451 and 6452 ... but we are not presented with that issue in the instant case.” (Draft op. pp. 22-23.) That is all my colleagues have to say about the matter' — that it is “not an issue.” My question is “why not?”
2. Rule of Lenity
But even if other judges see ambiguity where I see clarity, there is another ancient, sensible canon of statutory construction that leads to the same result. Where a penalty has not been endorsed through “deliberate, express, and full legislative consideration,” it should not be imposed when a reasonable alternative exists. That canon says that our constitutional philosophy of maximizing liberty over detention means that we must use a rule of lenity to prefer liberty over incarceration when in reasonable doubt as to the coverage of a criminal statute. This recent statement of the rule of lenity comes from the Supreme Court:
Under a long line of our decisions, the tie must go to the defendant. The rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them. See United States v. Gradwell, 243 U.S. 476, 485 [37 S.Ct. 407, 61 L.Ed. 857] (1917); McBoyle v. United States, 283 U.S. 25, 27 [51 S.Ct. 340, 75 L.Ed. 816] (1931); United States v. Bass, 404 U.S. 336, 347-49 [92 S.Ct. 515, 30 L.Ed.2d 488] (1971). This venerable rule not only vindicates the fundamental principles that no citizen should be held accountable for a violation of a statute whose commands are uncertain, or subjected to punishment that is not clearly prescribed. It also places the weight of inertia upon the party that can best induce Congress to speak more clearly and keeps the courts from making criminal law in Congress’s stead
*468 When interpreting a criminal statute, we do not play the part of mindreader. In our seminal rule-of-lenity decision, Chief Justice Marshall rejected the impulse to speculate regarding a dubious congressional intent. “[Probability is not a guide which a court, in construing a penal statute, can safely take.”
United States v. Santos, 553 U.S. 507, 514-15, 128 S.Ct. 2020, 2025-26, 170 L.Ed.2d 912 (2008) (parallel citations omitted).
It was an ancient rule of statutory construction that penal statutes should be “strictly construed” against the government or parties seeking to enforce statutory penalties and in favor of the persons on whom penalties are sought to be imposed. United States v. Wiltberger, 5 Wheat. 76, 18 U.S. 76, 5 L.Ed. 37 (1820) (“The rule that penal laws are to be construed strictly, is perhaps not much less old than construction itself.”). Today this principle simply means that words are given their ordinary meaning and that any reasonable doubt about the meaning is decided in favor of anyone subjected to a criminal statute. See generally Norman J. Singer, 3 Statutes and Statutory Construction § 59 (2000 ed.) (interpretation of penal statutes).
The Supreme Court has stated explicitly that the rule of lenity in interpreting criminal statutes is particularly applicable when analyzing a statute that would increase the punishment meted out to a defendant. “The policy of lenity means that the Court will not interpret a federal criminal statute so as to increase the penalty that it places on an individual when such an interpretation can be based on no more than a guess as to what Congress intended.” Ladner v. United States, 358 U.S. 169, 178, 79 S.Ct. 209, 3 L.Ed.2d 199 (1958); United States v. Bass, 404 U.S. 336, 348, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971) (The rule embodies “the instinctive distaste against men languishing in prison unless the lawmaker has clearly said they should.”). Here the “languishing” is for life versus a much shorter prison term.
In the realm of statutory interpretation, the Court implements due process requirements through the rule of lenity, which requires courts to give criminal defendants the benefit of the doubt when criminal statutes contain ambiguity concerning the elements of an offense or its punishment. See, e.g., United States v. Granderson, 511 U.S. 39, 54, 114 S.Ct. 1259, 127 L.Ed.2d 611 (1994) (applying the rule of lenity to a statutory ambiguity concerning sentencing); Dunn v. United States, 442 U.S. 100, 112, 99 S.Ct. 2190, 60 L.Ed.2d 743 (1979) (explaining that the rule of lenity “reflects not merely a convenient maxim of statutory construction,” but rather “is rooted in fundamental principles of due process which mandate that no individual be forced to speculate, at peril of indictment, whether his conduct is prohibited”).
From the face of the statute, there is no reason to think that “conviction” includes convictions for juvenile conduct; but, even if one believes that some ambiguity exists in the language or Congressional intent, “the tie must go to the defendant.” My colleagues have nothing at all to say in response to this canon of statutory interpretation. They are simply silent in the face of a rule that goes back centuries in Anglo-American law.
3. Consequences
In what seems to me my colleagues’ strained effort to justify the life sentence in this case based on juvenile conduct, they take account of neither the well-established canons of statutory construction discussed above nor the social consequences of what has only recently become conventional judicial behavior favoring long prison terms for nonviolent drug offenses. There are now numerous studies pointing *469 out the extreme financial and social costs of the huge increase in our U.S. prison population from less than half a million in 1980 to almost two and one-half million in 2009 — a five fold increase. Too Many Laws, Too Many Prisons, The Economist, July 22, 2010. The increase in our federal prison population has been even more dramatic, increasing to 211,000 during the same time period — a ten fold increase. U.S. Dep’t of Justice, Fed. Bureau of Prisons, Quick Facts about the Bureau of Prisons (2009) (available at http://www.bop. gov/news/quick.jsp# 4). By comparison, on a per capita basis, we have five times more people imprisoned than Great Britain and nine times more than Germany. The Economist, supra. Out of our total prison population in the United States, 140,000 are serving life imprisonment, including 6,000 life prisoners in the federal prison system, and more than a third (37.2%) of federal drug offenders are serving mandatory minimum sentences of 10 or more years. United States Sentencing Comm’n Annual Report for 2009 (found at http:// www.ussc.gov/ANNRPT/2009/table43.pdf).
Because of long sentences, drug offenders represent more than half of the federal prison population. U.S. Dep’t of Justice, Fed. Bureau of Prisons, Quick Facts about the Bureau of Prisons (2009) (available at http://www.bop.gOv/news/quick.jsp# 4) (51% of persons in federal prisons convicted of drug violations). As soon as one drug defendant is incarcerated for his offense, another steps into his shoes. Long periods of incarceration have done little except drive up the costs of our correction system and perhaps appeal to our retributive instinct to be “tough on crime” in our “War on Drugs.”
Penologists and other close observers of the penal system, along with budgetary experts who study the cost of our correction system,[3] call for alternatives to long periods of incarceration, including the reinvention of the parole systems to review the possibility of conditional release as prisoners reach middle and old age. Other techniques such as halfway houses, home confinement, and electronic monitoring could be employed to cut drastically the social and economic costs of long imprisonment.
The life sentence imposed in this case is not only contrary to well-established canons of statutory interpretation and has adverse social consequences for our country, it undermines longstanding constitutional values recently described in Graham v. Florida, — U.S.-, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010), striking down life imprisonment imposed on juveniles under the Eighth Amendment.
That case should at least make our court and the court system more sensitive to the important distinction between juvenile and adult criminal conduct. The Court points out that “life without parole sentences share some characteristics with death sentences that are shared by no other sentences”:
The State does not execute the offender sentenced to life without parole, but the sentence alters the offender’s life by a forfeiture that is irrevocable. It deprives the convict of the most basic lib *470 erties without giving hope of restoration, except perhaps by executive clemency— the remote possibility does not mitigate the harshness of the sentence.
A sentence lacking any legitimate penological justification is by its nature disproportionate to the offense. With respect to life without parole for juvenile non-homicide offenders, none of the goals of penal sanctions that have been recognized as legitimate — retribution, deterrence, incapacitation, and rehabilitation — provide an adequate justification.
A sentence of life imprisonment without parole, however, cannot be justified by the goal of rehabilitation. The penalty forswears altogether the rehabilitative ideal. By denying the defendant the right to re-enter the community, the State makes an irrevocable judgment about that person’s value and place in society.
Life in prison without the possibility of parole gives no chance for fulfillment outside prison walls, no chance for reconciliation with society, no hope. Maturity can lead to that considered reflection which is the foundation for remorse, renewal, and rehabilitation. A young person who knows that he or she has no chance to leave prison before life’s end has little incentive to become a responsible individual.
Id. at 2027-30, 2032 (citations omitted). Although the holding of the case is, technically speaking, probably not binding, all of these words apply equally to the defendant, Graham, in this case as they did for the defendant, Graham, in the recent Supreme Court case.
One more point: To all of these arguments — canons of construction, good policy, constitutional values — my colleagues offer one lame defense: “Graham was convicted of juvenile drug trafficking in a state court of general jurisdiction rather than one exclusively of juvenile jurisdiction,” and this “adult” conviction seems to mean to them that all arguments to the contrary are swept aside. They refer to such convictions for juvenile conduct as “adult convictions” when they really mean “juvenile convictions” in a state court of general jurisdiction. State courts differ significantly in how juvenile crime is prosecuted, and the application of federal law should not be made to turn on such random variations. The Supreme Court’s recent Graham case does not allow its ruling to turn on such state procedural variations.
Moreover, even the Sentencing Guidelines themselves — a source of very harsh punishments in drug cases — -in defining “convictions” to be used in criminal history calculations do not recognize such a distinction. Guideline § 4A1.1 (b) makes it clear that such a distinction is not to be recognized when “an adult or juvenile sentence [is] imposed for an offense committed prior to the defendant’s eighteenth birthday____” Thus every legitimate source of law I can find leads me to the conclusion that the courts should not count Graham’s juvenile conviction as a third strike.

. The statutory amendments read as follows in pertinent part:
SEC. 6451. VIOLENT FELONIES BY JUVENILES
Section 924(e) [Career Criminal Act] of title 18, United States Code, is amended ... (2) by adding at the end thereof the following:
"(C) the term 'conviction' includes a finding that a person has committed an act of juvenile delinquency involving a violent felony.”
*466 SEC 6452. LIFE IN PRISON FOR THREE-TIME DRUG OFFENDER.
(a) PENALTY FOR THIRD OFFENSE—
Section 401(b)(1)(A) of the Controlled Substances Act (21 U.S.C. 841(b)(1)(A)) is amended —
(1) in the sentence beginning “If any person commits” by striking "one or more prior convictions” through "have become final” and inserting "a prior conviction for a felony drug offense has become final”; and
(2) adding after such sentence the following: "If any person commits a violation of this subparagraph ... after two or more prior convictions for a felony drug offense have become final, such person shall be sentenced to a mandatory term of life imprisonment without release and fined in accordance with the preceding sentence.
Anti-Drug Abuse Act, Pub.L. No. 100-690, §§ 6451-52, 102 Stat. 4371 (1988).

. See extensive discussion and acceptance of this principle in United States v. Freeman, 44 U.S. (3 HOW) 556, 564, 11 L.Ed. 724 (1845) (discussing older English cases) ("all acts in pari mateña are to be taken together as if they were one law”).

. U.S. DEP’T OF JUSTICE, FY2008 BUDGET AND PERFORMANCE SUMMARY, available at http://www.usdoj .gov/jmd/2008summary/ pdf7127_bop.pdf. As of June 2008, the annual cost of incarceration was estimated at $24,922 per prisoner. Annual Determination of Average Cost of Incarceration, 73 Fed.Reg. 33853 (Dep’t of Justice, Bureau of Prisons June 13, 2008), http://www.thefederalregis1.er.com/d.p/2008-06-13-E8-13265. There are currently 210,774 federal prisoners (excluding those in halfway house and other facilities). U.S. DEP'T OF JUSTICE, BUREAU OF PRISONS, WEEKLY POPULATION REPORT (August 26, 2010), available at http://www. bop.gov/locations/weekly_report.jsp.