BAILEY, District Judge,
concurring in part and dissenting in part:
I am pleased to concur in that part of the majority opinion affirming the District Court’s decision with respect to Article III standing and the fact that the subject bears are indeed grizzly bears. I feel compelled, however, to respectfully dissent from the majority’s interpretation of 50 C.F.R. § 17.3.
50 C.F.R. § 17.3 provides:
Harass in the definition of “take” in the Act means an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering. This definition, when applied to captive wildlife, does not include generally accepted:
(1) Animal husbandry practices that meet or exceed the minimum standards for facilities and care under the Animal Welfare Act,
(2) Breeding procedures, or
(3) Provisions of veterinary care for confining, tranquilizing, or anesthetizing, when such practices, procedures, or provisions are not likely to result in injury to the wildlife.
Harm in the definition of “take” in the Act means an act which actually kills or injures wildlife. Such act may include *512 significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering.
50 C.F.R. § 17.3.
“ ‘When a species . . is listed as either “threatened’? or “endangered” under the [ESA], it-is then subject to a host of protective measures designed to conserve the species.’ Safari Club Int’l v. Salazar (In re Polar Bear Endangered Species Act Listing & Section 4(d) Rule Litig. MDL No. 1993), 709 F.3d 1, 2 (D.C. Cir. 2013). The species are subject, for example, to the section 9 prohibitions, which make it unlawful ‘for any person subject to the jurisdiction of the United States’ to, inter alia, ‘importf,]’ ‘export [,] ‘possess, sell, deliver, carry, transport, or ship, by any means whatsoever!?,]’ ‘take any such species within the United States or the territorial sea of the United States[,]’ ‘deliver, receive, carry, transport, or ship in interstate or foreign commerce, by any means whatsoever and in the course of a commercial activity, any such species[,]’ or to ‘sell or offer for sale in interstate or foreign commerce any such species[.]’ 16 U.S.C. § 1538(a); see also Humane Soc’y of U.S. v. Kempthorne, 527 F.3d 181, 182 (D.C. Cir. 2008);....
“The prohibition on ‘take’ means that it is unlawful ‘to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct.’ 16 U.S.C. § 1532(19). In particular, the term ‘harm’ refers to ‘an act which actually kills or injures wildlife!?,)’ while the term ‘harass’ means ‘an intentional or negligent act or omission which creates the likelihood of. injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding or sheltering,’ 50 C.F.R. § 17,3. When applied to captive animals, the definition for ‘harass’ does not include the ‘generally accepted’ practices of animal husbandry, breeding, or aspects of veterinary care. Id.” Safari Club Int’l v. Jewell, 960 F.Supp.2d 17, 30-31 (D. D.C. 2013).
For a threatened species, like the grizzly bear, the ESA provides that the FWS or the National Marine ’Fisheries Service shall promulgate regulations that they deem “necessary and advisable to provide for the conservation of such species,” including applying some or all of the Section 9 prohibitions to the threatened species, 16 U.S.C. § 1533(d).
FWS regulations specifically prohibit the “taking” of any grizzly bear in the 48 conterminous states of the United States, including North Carolina. 50 C.F.R. § 17.40(b)(l)(i)(A).
In promulgating the exception for captive animals contained in 50 C.F.R. § 17.3, the Fish and Wildlife Service stated that the “purpose of amending the Service’s definition of ‘harass’ is to exclude proper animal husbandry practices that are not likely to result in injury from the prohibition against ‘take.’ Since captive animals can be subjected to improper husbandry as well as .to harm and other taking activities, the Service considers it prudent to maintain such protections, consistent with Congressional intent.” Captive-bred Wildlife Regulation, 63 FR 48634-02 (September 11, 1998).
The FWS further stated that “ ‘Harass’ under the definition of ‘take’ in § 17.3 is an act or omission that creates the likelihood of injury by annoying wildlife to such an extent as to significantly disrupt normal behavior patterns. The applicability of this concept to captive-held animals has been unclear, since human activities, including normal husbandry practices, provided in caring for captive-held wildlife in all probability disrupt behavior patterns.” Id.
*513 The FWS added that “[i]n light of this, the definition of ‘harass’ in 50 CFR 17.3 is modified to exclude normal animal husbandry. practices that are not likely to result in injury such as humane and healthful care when applied to captive wildlife. While no permit is, required to possess lawfully acquired listed wildlife, a person cannot possess wildlife without doing something to it that might be construed as harassment under a literal interpretation of the definition in use since 1979, e.g., keep it in confinement, provide veterinary care, etc. Under this scenario, a person who legally possessed wildlife without a permit could be considered in violation of the prohibition against harassment unless they obtained a specific permit that authorized them to conduct normal animal husbandry activities. Had Congress intended this result, the prohibition on possession in section 9 of the Act would not have been limited to endangered species taken in violation of the Act.” Id.
The crux of this case is the appropriate construction of 50 C.F.R. § 17.3. An issue of statutory construction is reviewed de novo. United States v. Hilton, 701 F.3d 959 (4th Cir. 2012).
The interpretation adopted by the majority would have the standards to be applied to holders of captive, threatened animals established, not by the FWS, but rather by some amorphous set of “generally applicable” standards adopted by the AZA (representing less than 10% of the zoos in this country) or some other group. In analyzing the regulation, it is important to recall that the statute provides criminal sanctions for violations of its terms or of the regulations adopted pursuant thereto - a fact the majority ignores. In short, the ESA has both criminal and non-criminal aspects.
In light of the criminal aspect, the rule of lenity could be deemed to be in play, “It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important valuer First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that Jie may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards .for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant -dangers of arbitrary and discriminatory application,” Grayned v. City of Rockford, 408 U.S. 104, 108-09, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) (footnotes omitted).
The rule of lenity “reflects not merely a convenient maxim of statutory construction. Rather, it is rooted in fundamental principles of due process which mandate that no individual be forced to speculate, at peril of indictment, whether his conduct is prohibited. Grayned v. City of Rockford, 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); United States v. Harriss, 347 U.S. 612, 617, 74 S.Ct. 808, 98 L.Ed. 989 (1954); Lanzetta v. New Jersey, 306 U.S. 451, 453, 69 .S.Ct. 618, 83 L.Ed. 888 (1939); McBoyle v. United States, 283 U.S. 25, 27, 51 S.Ct. 340, 75 L.Ed. 816 (1931). Thus, to ensure that a legislature speaks with special clarity when marking the boundaries of criminal conduct, courts must decline to impose punishment for actions that are nQt ‘plainly and unmistakably’ proscribed. United States v. Gradwell, 243 U.S. 476, 485, 37 S.Ct. 407, 410, 61 L.Ed. 857 (1917).” Dunn v. United *514 States, 442 U.S. 100, 112-13, 99 S.Ct. 2190, 60 L.Ed.2d 743 (1979).
“The rule of lenity is based on two substantial considerations. First, the rule recognizes that ‘a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed.’ Yi v. Fed. Bureau of Prisons, 412 F.3d 526, 535 (4th Cir. 2005) (quoting Babbitt v. Sweet Home Chapter of Cmtys., 515 U.S. 687, 704 n. 18, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995)). Second, the rule acknowledges that Congress, rather than the judiciary, is the proper institution to define criminal conduct. Id.” United States v. Hilton, 701 F.3d 959, 968 (4th Cir. 2012).
While it is unclear whether the rule of lenity applies in a civil dispute, in Esquivel-Quintana v. Lynch, 810 F.3d 1019 (6th Cir. 2016), reversed, — U.S. -, 137 S.Ct. 1562, 198 L.Ed.2d 22 (2017), the Sixth Circuit noted that the reasons for the rule are equally applicable in cases where a regulation has both civil and criminal ramifications, stating that “[a]n increasingly emergent view asserts that the rule of lenity ought to apply in civil cases involving statutes that have both civil and criminal applications. See Whitman v. United States, — U.S. -, 135 S.Ct. 352, 352-54, 190 L.Ed.2d 381 (2014) (Scalia, J., statement respecting denial of certiora-ri); Carter v. Welles-Bowen Realty, Inc., 736 F.3d 722, 729-36 (6th Cir. 2013) (Sutton, J., concurring). This view is based on two principles. First, statutory terms should not have different meanings in different cases—‘a statute is not a chameleon.’ Carter, 736 F.3d at 730. Second, ambiguous statutes must be construed in favor of defendants under the rule of lenity. The rule of lenity ensures that the public has adequate notice of what conduct is criminalized, and preserves the separation of powers by ensuring that legislatures, not executive officers, define crimes. Taken together, these two principles lead to the conclusion that the rule of lenity should apply in civil cases involving ambiguous statutes with criminal applications.” Esquivel-Quintana, at 1023.
The Supreme Court has suggested that the rule of lenity should apply in such cases. In Leocal v. Ashcroft, 543 U.S. 1, 125 S.Ct. 377, 160 L.Ed.2d 271 (2004), the Court reviewed a Board of Immigration Appeals decision interpreting 8 U.S.C. § 1101(a)(43)(F). 543 U.S. 1, 8-13, 125 S.Ct. 377, 160 L.Ed.2d 271 (2004). That provision states that a conviction for a ‘crime of violence (as defined in section 16 of Title 18, but not including a purely political offense)’ counts as an aggravated felony if it is punishable by at least one year of imprisonment. The Court held that ‘crime of violence’ did not include the petitioner’s Florida DUI conviction, and added in a footnote:
Even if § 16 lacked clarity on this point, we would be constrained to interpret any ambiguity in the statute in petitioner’s favor. Although here we deal with § 16 in the deportation context, § 16 is a criminal statute, and it has both criminal and noncriminal applications. Because we must interpret the statute consistently, whether we encounter its application in a criminal or nonciiminal context, the rule of lenity applies. Cf. United States v. Thompson/Center Arms Co., 504 U.S. 505, 517-518, 112 S.Ct. 2102, 119 L.Ed.2d 308 (1992) (plurality opinion) (applying the rule' of lenity to a tax statute, in a civil setting, because the statute had criminal applications and thus had to be interpreted consistently with its criminal applications).
543 U.S. at 12, n. 8, 125 S.Ct. 377.
Similarly, in Kasten v. Saint-Gobain Performance Plastics Corp., 563 U.S. 1, *515 131 S.Ct. 1325, 179 L.Ed.2d 379 (2011), and Maracich v. Spears, — U.S. -, 133 S.Ct. 2191, 2209, 186 L.Ed.2d 275 (2013), the Court suggested that the rule of lenity could apply if an ambiguity existed, but had no occasion to apply it because the statute was unambiguous.” Id.
An application of the rule of lenity to the regulatory framework adopted by the majority clearly indicates that the same cannot pass muster. As envisioned by the majority, whether an action or inaction on the part of a zookeeper was legal would depend on the current opinion, not codified in any form, of non-government members of certain associations or the general public. Such a framework hardly provides a person with fair warning of what the law intends to do if a certain line is passed. In addition, such a framework violates the separation of powers by allowing non-governmental entities, not legislatures, or even executive officers, define crimes.
Inasmuch as the majority’s framework is unworkable and violative of due process, the only appropriate reading of the regulation is that the Secretary of Agriculture, taking into consideration generally accepted practices, is to determine, establish, and enforce the minimum standards for operators holding captive, threatened animals.
Were the rule of lenity not to apply, the majority’s interpretation of the regulation still violates the rubrics of statutory construction.
In interpreting a statute, “[w]e give the words of a statute their ordinary, contemporary, common meaning, absent an indication Congress intended them to bear some different import.” Wall v. Kholi, 562 U.S. 545, 551, 131 S.Ct. 1278, 179 L.Ed.2d 252 (2011), quoting Williams v. Taylor, 529 U.S. 420, 431, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000).
“It is ‘a cardinal principle of statutory construction’ that ‘a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.’ Duncan v. Walker, 533 U.S. 167, 174, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001) (internal quotation marks omitted); see United States v. Menasche, 348 U.S. 528, 538-39, 75 S.Ct. 513, 99 L.Ed. 615 (1955) (‘It is our duty “to give effect, if possible, to every clause and word of a statute.’” (quoting Montclair v. Ramsdell, 107 U.S. 147, 152, 2 S.Ct. 391, 27 L.Ed. 431 (1883))).” TRW Inc. v. Andrews, 534 U.S. 19, 31, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001).
The District Court was correct in its conclusion of law that according to the plain language of 50 C.F.R. § 17.3, an exhibitor’s husbandry practices which comply with the minimum standards for facilities and care under the AWA fall outside the definition of “harassment” as set forth in the ESA and in concluding that “[o]nly when the exhibitor’s practices fail to meet the minimum standards established by the Animal Welfare Act can such practices constitute ‘harassment’ of a captive endangered or threatened species.” Hill v. Coggins, 2016 WL 1251190, at *13 (W.D. N.C. Mar. 30, 2016).
The focus of 50 C.F.R. § 17.3(1) is on the standards promulgated under the AWA—not upon some ambiguous and undefinable “generally accepted” standards disconnected from the standards of the AWA. Adopting the majority’s interpretation ignores the clear intent of the ESA to allow the AWA to establish the standards regarding acceptable husbandry practices. Under 16 U.S.C. § 1533(d), it is the FWS that is to promulgate regulations that are deemed “necessary and advisable to provide for the conservation of such species.”
The majority’s interpretation also places the court in the untenable position of being *516 required to become a non-judicial rule making body determining exactly what are “generally accepted” animal husbandry practices. Are the accreditation standards of the AZA, a voluntary organization that encompasses less than ten percent of the exhibitors in the United States necessarily “generally accepted?” The difficulty in determining what is a “generally accepted” husbandry practice is proof that the issue is not one for judicial determination. Rather, the determination of what is “generally accepted” is why the ESA defers to the AWA on this issue.
The District Court’s interpretation of 50 C.F.R. § 17.3 does not permit the AWA standards to supercede the ESA’s authority to protect threatened species. Rather, the regulation utilizes the framework of the AWA for evaluation of the adequacy of animal husbandry practices for captive animals. Should the FWS become unsatisfied with the standards of the AWA, the FWS has the authority to amend the regulatory scheme to provide for more stringent protections for threatened or endangered species.
The Plaintiffs’ argument that the FWS regulatory language creating the “harass” exception for captive wildlife found at 63 Fed. Reg. 48636, requires that the courts look outside the enforcement of the AWA by the Department of Agriculture’s Animal Plant and Health Inspection Service (“APHIS”) to determine what is “generally acceptable”[1] is not a proper interpretation of that provision. A full reading of the surrounding language with the comments section supports the opposite conclusion— that the Fish and Wildlife Service decides the applicable standards for animal husbandry:
To evaluate facilities and care provided by applicants, the [Fish and Wildlife Service] will continue to consult with experts such as the Department of Agriculture’s Animal and- Plant Health Inspection Service, which is charged with administering the Animal Welfare Act, and knowledgeable persons' in the zoó and aquarium communities and the private sector as needed.

Id.

Rather than allowing for private experts to testify what the appropriate standards for animal husbandry are, this language indicates that the FWS may consult with experts at APHIS and private experts in determining whether any change in the standards is warranted. This comment in no way makes private expert opinions that were not incorporated by the FWS into the ESA relevant to the issue as to the applicable standard of “generally accepted animal husbandry practices that meet or exceed the minimum standard for facilities and care under the Animal Welfare Act.” 50 C.F.R. § 17.3(1). As a result, the District Court did not err in -its conclusion that “[w]hether the CBZ’s practices are generally accepted by other zookeepers or meet certain standards established by state law or voluntary accrediting associations such as the AZA is not relevant.” 2016 WL 1251190, at *13.
The majority expresses concern that the District Court’s construction of § 17.3 would negate the breeding procedure and veterinary care portions of the regulation. It is readily apparent that the drafters of the regulation saw fit to treat animal hus *517 bandry differently than the other provisions.
There is a rational explanation for this differential. The standard of care for veterinary practice is, like the standard of care or medical practice, well established. Breeding practices are virtually a subset of the veterinary standard. Animal husbandry practices ■ are not so well established and, as noted, above, should not be left to an amorphous segment of expert or public opinion.
The only appropriate reading of the regulation is that the Secretary of Agriculture, taking into consideration generally accepted practices, is to determine, establish, and enforce the minimum standards for operators holding captive, threatened animals.
I would affirm the judgment of the District Court.

. "FWS made it clear that in determining whether treatment of captive endangered species was considered ‘generally accepted’ under the captive wildlife exception to 'harass' it was not looking only to [APHIS], which is charged with administering the AWA, but also to ‘knowledgeable persons in the zoo and aquarium communities.’ ” Brief of Appellants at 29-30.