OPINION
SUTTON, Circuit Judge.
Under the Real Estate Settlement Procedures Act, a title services company may not pay a real estate agent a fee in exchange for a referral. 12 U.S.C. § 2607(a). Exempted from this prohibition are “affiliated business arrangements.” Id. § 2607(c)(4). The statute establishes three prerequisites for this safe harbor, and everyone agrees that the defendants in this case (several realty companies and title companies) satisfied them. The plaintiffs (three home buyers) claim that the defendants nevertheless fall outside the safe harbor’s coverage because they failed to satisfy a fourth condition announced by the Department of Housing and Urban Development through a policy statement. As that policy statement is not binding on the Department or anyone else and as it is not otherwise entitled to deference, it does not supplement the Act’s existing safe-harbor conditions. We affirm.
I.
Welles-Bowen is a real estate agency. It helps people buy homes. WB Title and Chicago Title are title services companies. They help people confirm the true ownership of a house before they buy it.
Welles-Bowen, WB and Chicago are related to one another along two dimensions — their ownership and their business. As for ownership: The people who own Welles-Bowen also own a holding company that in turn owns about half of WB. Chicago owns the other half of WB. As for business: Welles-Bowen often refers prospective buyers to WB for title services. WB in turn contracts some of the referred work out to Chicago. In the main Chicago gathers evidence relating to the title, and WB evaluates this evidence to determine the title’s validity.
When Erick and Whitney Carter bought a home in 2005, they used Welles-Bowen as their real estate agent. Like other Welles-Bowen clients, they received a referral to WB. And like other WB customers, they saw much of their title work contracted out to Chicago. The Carters did not like this arrangement. To their way of thinking, WB was a shell corporation that funneled referral fees between Chicago and Welles-Bowen. They sued all of the companies under the Real Estate Settlement Procedures Act. Joining the Carters in the lawsuit was Joshua Grzeeki, a buyer who raised similar claims against a similar set of companies. The companies responded that they satisfied the Act’s safe-harbor requirements and that a policy statement issued by the Department of Housing and Urban Development could not impose a new requirement on them.
*725 The district court sided with the companies, holding the policy statement invalid. After the buyers appealed, the United States intervened to defend the validity of the policy statement.
II.
A.
Buying a home involves more than looking at the house, negotiating a price and signing the contract. Before closing the deal, a prudent buyer asks a title agency to check the title for its validity, a pest control company to check the house for termites, an attorney to check the contract for legal errors, and so forth. All of these tasks go by the name of “settlement services.” 12 U.S.C. § 2602(3).
The Real Estate Settlement Procedures Act regulates settlement services. Its leading provision prohibits giving or receiving “any fee ... pursuant to any agreement or understanding ... that business incident to ... a real estate settlement service ... shall be referred.” Id. § 2607(a). Anyone who violates the provision commits a crime punishable with up to a year in prison. Id. § 2607(d)(1). A violator also faces civil liability through private-enforcement actions as well as through public-enforcement actions. Id. § 2607(d)(2), (4). The Department of Housing and Urban Development once administered the enforcement provisions, but legislation passed after this • case began transferred this task to the new Consumer Financial Protection Bureau. Id. § 2617.
As enacted in 1974, the Act produced uncertainty about its application to referrals between affiliated companies. Suppose a real estate agent refers a client to a title company that the agent owns in part. Consistent with the Act, the agent does not receive a separate fee for making the referral. But the referral gives the title company more business, which in turn increases the title company’s profits, which in turn increases the dividends paid to the real estate agent. Does this indirect benefit to the agent constitute a prohibited referral fee?
Congress gave one answer to this question in 1983 when it added a safe harbor for “affiliated business arrangements.” Id. § 2607(c)(4). The provision covers arrangements in which the person making the referral “has either an affiliate relationship with or a direct or beneficial ownership interest of more than 1 percent in” the settlement-service provider receiving the referral. Id. § 2602(7). An arrangement qualifies for the safe harbor if it meets three conditions: (1) The person making the referral must disclose the arrangement to the client; (2) the client must remain free to reject the referral; and (3) the person making the referral cannot receive any “thing of value from the arrangement” other than “a return on the ownership interest or franchise relationship.” Id. § 2607(c)(4). Each of these requirements, but most especially the third, see 24 C.F.R. § 3500.15(b)(3)(iii), restricts the use of sham affiliated business arrangements to circumvent the prohibition on referral fees.
B.
The buyers claim that the profits earned by the owners of Welles-Bowen and WB constitute prohibited referral fees due to their relationship with WB. There is an easy way to look at this claim and a more complicated way to look at it.
The easy way turns on the safe harbor provisions spelled out in § 2607(c)(4). Welles-Bowen’s relationship with WB qualifies as an “affiliated business arrangement.” The buyers agree that Welles-Bowen had an “affiliate relationship” with WB, that Welles-Bowen made referrals to *726 WB, and that WB in turn provided settlement services. 12 U.S.C. § 2602(7). This relationship also satisfied the three safe-harbor conditions. Welles-Bowen disclosed the arrangement to the buyers, Welles-Bowen allowed them to reject the referrals, and neither Welles-Bowen nor its owners received anything of value from the arrangement apart from a return on their ownership interests. Id. § 2607(c)(4). Welles-Bowen and WB in short did everything the Act asked of them. They thus qualify for the affiliated business arrangement exemption.
The more complicated way of looking at the claim must account for the policy statement issued by the Department of Housing and Urban Development in 1996. See Statement of Policy 1996-2 Regarding Sham Controlled Business Arrangements, 61 Fed.Reg. 29,258 (1996). The statement announced that, despite the three safeguards already contained in § 2607(c)(4), affiliated business arrangements must satisfy a fourth requirement: “[T]he entity receiving the referrals of settlement service business must be a ... bona fide provider of settlement services.” Id. at 29,262. In addition, the statement continues, “[t]he Department will consider” a series of factors “and will weigh them in light of the specific facts” when separating bona fide providers from shams. Id. The ten factors include whether the provider has “sufficient initial capital and net worth,” whether it has “its own employees,” and whether it -is “located at the same business address as one of the parent providers.” Id. Claiming that the various companies do not satisfy this ten-factor test, the buyers argue that the statutory safe harbor for an affiliated business arrangement does not apply to them.
The short answer to this claim is that a statutory safe harbor is not very safe if a federal agency may add a new requirement to it through a policy statement. The long answer is that the policy statement is not entitled to Chevron deference or Skidmore consideration, and as a result compliance with the three conditions set out in the statute suffices to obtain the exemption.
Deference under Chevron v. Natural Resources Defense Council comes into play only when an agency offers a binding interpretation of a statute that it administers. 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). As the government concedes, the policy statement’s ten-factor test is not a binding interpretation of the Act. The statement instead informs the public that the Department plans to “consider” these factors when separating bona fide providers from shams. That is another way of saying the statement offers non-binding advice about the agency’s enforcement agenda, not a controlling interpretation of the statute. Agency recommendations of this sort, even when cast as policy considerations or preferences, do not bind courts tasked with interpreting a statute.
The government tries to address this problem by claiming that the policy statement contains two parts. The first half, it claims, announces the Department’s binding view that only bona fide providers of settlement services qualify for the safe harbor, and the second half presents nonbinding advice about how to separate genuine providers from shams. The government claims that the first half of the statement deserves deference even if the second does not.
This theory faces several obstacles. The first is that the statute already contains three conditions that protect buyers against affiliated business arrangements involving sham providers. The bare statement that the safe harbor excludes shams, *727 shorn of the ten-factor test for separating the genuine from the fake, adds nothing to the statute’s text. Put another way, why not say that a provider qualifies as “bona fide” under the first half of the policy statement so long as it provides some settlement services, and so long as the arrangement to which it belongs satisfies the criteria laid out in § 2607(c)(4)? That of course is what the statute already does, and the defendants already met these criteria.
But suppose for argument’s sake that the first half of the policy statement requires courts to conduct a freestanding inquiry into the provider’s genuineness, and that this inquiry has nothing to do with the requirements detailed in § 2607(c)(4). If the ten-factor test does not guide the courts’ performance of this task, what does? The government does not say, leaving us to figure out the answer for ourselves. That reality counts against deferring to the policy statement — even just the first half of the policy statement. The point of Chevron is to encourage agencies to resolve statutory ambiguities, not to create new uncertainties.
Even if the government could overcome this impediment, it would face another obstacle. United States v. Mead Corp. holds that an agency interpretation receives Chevron deference only if “Congress delegated authority to the agency generally to make rules carrying the force of law, and ... the agency interpretation claiming deference was promulgated in the exercise of that authority.” 533 U.S. 218, 226-27, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001). Because a policy statement does not speak “with the force of law,” the Supreme Court has concluded that “interpretations contained in policy statements ... do not warrant Chevron-style deference.” Christensen v. Harris County, 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000). Even if this is just a norm and not an “absolute rule,” Barnhart v. Walton, 535 U.S. 212, 222, 122 S.Ct. 1265, 152 L.Ed.2d 330 (2002), the buyers and the government offer no persuasive reason to depart from this norm.
The criminal penalties included in the statute reinforce this application of Mead. See id. at 222, 121 S.Ct. 2164 (characterizing one of the Mead totality-of-the-circumstances factors as “the nature of the question at issue”). A single statute with civil and criminal applications receives a single interpretation. See Leocal v. Ashcroft, 543 U.S. 1,11 n. 8, 125 S.Ct. 377, 160 L.Ed.2d 271 (2004); United States v. Thompson/Center Arms Co., 504 U.S. 505, 518 n. 10, 112 S.Ct. 2102, 119 L.Ed.2d 308 (1992) (plurality opinion). A bedrock principle of American law requires the government to give the people fair notice of what conduct it has made a crime. See McBoyle v. United States, 283 U.S. 25, 27, 51 S.Ct. 340, 75 L.Ed. 816 (1931). Even if we assume that a regulation that authoritatively interprets a statute with criminal applications provides fair warning, see Babbitt v. Sweet Home Chapter of Communities for a Great Oregon, 515 U.S. 687, 704 n. 18, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995), it is difficult to see how a mere policy statement or opinion letter or agency manual could be up to the task. The government’s duty of fair notice precludes us from supplementing the safeguards expressed on- the face of the statute with a multi-factor blend that the statute nowhere mentions.
Unable to get help from Chevron, the buyers seek refuge in Skidmore v. Swift & Co., 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944), which entitles an agency’s position to weight in proportion to its persuasiveness. Our main reason for denying Chevron deference applies equally to Skidmore: The policy statement does not *728 present its multifactor test as the agency’s interpretation of the Act but only as guidelines that the agency intends to consider.
The government’s attempt to divide the policy statement into two halves helps even less here than it did under Chevron. Taken by itself, the first half of the statement provides no guidance about how to apply the requirement it seeks to import into the statute. Nor does this part of the statement explain how this imprecision is compatible with the imperative to provide fair warning in the criminal context. These omissions rob the policy statement of persuasive force.
According to the buyers’ final and most far reaching argument, the statute, quite apart from any deference owed to the agency’s views, implicitly contains the requirement mentioned in the policy statement. The buyers find a textual hook for this argument hidden in a dependent relative clause in the Act’s definition section:
[T]he term “affiliated business arrangement” means an arrangement in which (A) a person who is in a position to refer business incident to or part of a real estate settlement service involving a federally related mortgage loan, or an associate of such person, has either an affiliate relationship with or a direct or beneficial ownership of more than 1 percent in a provider of settlement services; and (B) either of such persons directly or indirectly refers such business to that provider or affirmatively influences the selection of that provider.
12 U.S.C. § 2602(7) (emphasis added). According to the buyers, the italicized phrase “provider of settlement services” means “bona fide provider of settlement services,” and whether a provider qualifies as bona fide turns on the factors identified in the policy statement.
We cannot agree. The most natural interpretation of “provider of settlement services” is ... one who provides settlement services. And the buyers concede that WB provides settlement services.
The structure of the safe harbor supports this interpretation. The Act requires affiliated business arrangements to satisfy three requirements in order to obtain an exemption from the ban on referral fees, id. § 2607(c)(4), and proceeds to spell out the requirements in painstaking detail. For example, when the Act requires the person making the referral to disclose the arrangement to the client, it specifies the disclosure’s content, timing and mode of delivery, establishing separate rules for face-to-face referrals, referrals in writing, referrals by email and referrals by telephone. Id. § 2607(c)(4)(A). The express inclusion of these precise requirements counsels against discovering an additional requirement in the implications of a phrase tucked away in a dependent relative clause elsewhere in the statute. See Bruesewitz v. Wyeth LLC, — U.S. -, 131 S.Ct. 1068,1076,179 L.Ed.2d 1 (2011).
Statutory context fortifies this conclusion. The Act establishes other safe harbors from its ban on referral fees, distinct from the safe harbor for affiliated business arrangements. One of these exceptions protects “the payment to any person of a bona fide salary or compensation or other payment for goods or facilities actually furnished or for services actually performed.” 12 U.S.C. § 2607(c)(2). The Act thus uses “bona fide” in the salary-or-compensation exception but omits the phrase in the affiliated-business-arrangement exception. This disparity confirms that the latter exception does not call upon courts to conduct a freestanding inquiry into a provider’s bona fides unconnected to the safe-harbor test already baked into the statute. See Russello v. United States, *729 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983).
The buyers respond by claiming that our interpretation frustrates the Act’s purpose of prohibiting referral fees. But elastic notions of statutory purpose have diminished value in interpreting a statute as precise and reticulated as the Real Estate Settlement Procedures Act. The best evidence of legislative purpose usually comes from the four corners of the statute, and that text provides more than adequate evidence of statutory purpose here.
Purpose at any rate is a two-edged sword, and in this instance it furthers our interpretation. Consider the purpose of the safe harbor. As the policy statement itself explains, the statute as first enacted created legal uncertainty about profiting from referrals to affiliated companies. Congress created the affiliated-business-arrangement safe harbor to eliminate this uncertainty. The statute’s precision in defining the boundaries of this exception reflects this objective. A multi-factor inquiry that seeks to distinguish bona fide providers from shams in new ways would reintroduce much of the uncertainty the safe harbor meant to eliminate.
In the last analysis, Welles-Bowen’s arrangement with WB (and for similar reasons the arrangement between the companies sued by Grzecki) qualifies for the affiliated-business-arrangement exception, as the district court rightly held. Because we have ruled for the defendants on the merits, we need not consider the plaintiffs’ challenge to the district court’s denial of class certification.
III.
For these reasons, we affirm.