# SUPREME COURT OF THE UNITED STATES

## THOMAS H. BUFFINGTON *v.* DENIS R. MCDONOUGH, SECRETARY OF VETERAN AFFAIRS

### ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

No. 21–972. Decided November 7, 2022

The petition for a writ of certiorari is denied.

JUSTICE GORSUCH, dissenting from the denial of certiorari.

Thomas Buffington served this Nation well but the Department of Veterans Affairs (VA) failed him. Relying on its own internal regulations, the agency denied Mr. Buffington disability benefits that Congress promised him by statute. Nor is Mr. Buffington's case an isolated one. The VA's misguided rules harm a wide swath of disabled veterans. Making matters worse, the lower courts in this case turned aside Mr. Buffington's petition asking them to set aside the agency's regulations and apply Congress's statutory instructions as written. Instead, the courts invoked "*Chevron* deference," bypassed any independent review of the relevant statutes, and allowed the agency to continue to employ its rules to the detriment of veterans. Respectfully, those who have served in the Nation's Armed Forces deserve better from our agencies and courts alike.

*

During his eight years in the Air Force in the 1990s, Mr. Buffington suffered a facial scar, a back injury, and tinnitus. After his discharge in 2000, he joined the Air National Guard. At about the same time and in recognition of injuries he suffered while on active duty, the VA assessed Mr. Buffington 10 percent disabled and awarded him benefits. The VA did this pursuant to a congressional promise that "the United States will pay" compensation "[f]or disability

resulting from personal injury suffered or disease contracted in line of duty." 38 U. S. C. §1131.

Mr. Buffington's time away from active duty proved short lived. In 2003, the federal government called his Guard unit into service. As a result, Mr. Buffington served again on active duty, including from July 2003 to June 2004, and from November 2004 to July 2005. During Mr. Buffington's time on active duty, the VA suspended his disability benefits. In doing so, everyone agrees that the agency acted properly under a statute that empowers it to withhold benefits "for any period for which [a service member] receives active service pay." §5304(c).

The trouble began after Mr. Buffington left active duty in 2005 and the VA failed to resume his disability benefits. When Mr. Buffington realized what had happened and inquired about the problem in January 2009, the agency acknowledged its legal duty to pay and agreed to resume future benefits. But the agency also informed Mr. Buffington that it refused to pay benefits retroactively beyond February 2008. All of which meant that Mr. Buffington missed out on about three years of disability payments, from 2005 to 2008.

Why did the VA refuse to pay these benefits? According to current agency rules, a veteran must *ask* for his disability payments to resume after a second (or subsequent) stint on active duty. If a veteran fails to ask for his benefits again, the agency will not provide them. Nor will the agency pay benefits retroactively beyond "1 year prior to the date" of a veteran's reinstatement request. 38 CFR §3.654(b)(2) (2021).

In the Court of Appeals for Veterans Claims, Mr. Buffington challenged the agency's rules as inconsistent with Congress's statutory commands. After all, the law says that the VA may suspend disability payments *only* for periods when a veteran "receives active service pay." 38 U. S. C. §5304(c). The court, however, found it unnecessary to decide for itself

whether Mr. Buffington's reading of the law was the best one. Instead, the court concluded that "Congress did not speak to the precise question at issue: Whether the Secretary may predicate the effective date for the recommencement of benefits on the date of the veteran's claim." *Buffington* v. *Wilkie*, 31 Vet. App. 293, 301 (Ct. App. Vet. Cl. 2019). Given that asserted ambiguity, the court invoked *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837 (1984), and deferred to the agency's rules. More of the same awaited Mr. Buffington in his appeal to the Federal Circuit. See 7 F. 4th 1361 (2021).

Still, not everyone saw the case the same way. In the Federal Circuit, Judge O'Malley dissented, arguing that Mr. Buffington should have prevailed based on bedrock principles of statutory interpretation. The law Congress adopted promised Mr. Buffington benefits from the moment he left active duty in 2005; the VA had no business requiring him to petition for them a second time; and the agency had no business withholding three years' worth of overdue payments. See *id.*, at 1367–1368. In the Court of Appeals for Veterans Claims, Judge Greenberg contended that the majority's invocation of *Chevron* was "nothing more than a rubber stamping of the Government's attempt to misuse its authority granted" by Congress. 31 Vet. App., at 308. Courts, he said, must "stop this business of making up excuses for judges to abdicate their job of interpreting the law." *Id.*, at 307 (internal quotation marks omitted).

I very much doubt that the courts below did right by Mr. Buffington. As Judges O'Malley and Greenberg highlighted, Congress has instructed the VA to make disability payments to injured veterans like Mr. Buffington. In §5304(c), Congress suspended that obligation only for periods when a veteran "receives active service pay." Nothing in the statute requires a veteran to ask the agency to resume benefits it is already legally obligated to pay. Nor

does anything in the statute allow the VA to withhold over-due benefits. It seems that even the VA once acknowledged all this. Before adopting its current rules, the agency's *previous* rule imposed no time bar and indicated that payments "may be resumed *the day following release* from active duty if otherwise in order." 26 Fed. Reg. 1599 (1961) (emphasis added) (establishing 38 CFR §3.654(b)).

Even more troubling than the answer the lower courts reached in this case, however, is *how* they got there. Neither the Court of Appeals for Veterans Claims nor the Federal Circuit offered a definitive and independent interpretation of the law Congress wrote. Instead, both courts simply deferred to the agency's (current) regulations as "reasonable" ones and said this Court's decision in *Chevron* required them to do so. That kind of judicial abdication disserves both our veterans and the law.

\*

From the beginning of the Republic, the American people have rightly expected our courts to resolve disputes about their rights and duties under law without fear or favor to any party—the Executive Branch included. See A. Bamzai, The Origins of Judicial Deference to Executive Interpretation, 126 Yale L. J. 908, 987 (2017). In this country, it was "well established" early on that courts are not "bound by . . . administrative construction[s]" of the law and those constructions may "be taken into account only to the extent that [they are] supported by valid reasons." *Burnet* v. *Chicago Portrait Co.*, 285 U. S. 1, 16 (1932).

To be sure, as the administrative state spread its wings in the 1940s this Court toyed with the possibility of "depart[ing] from [this] longstanding tradition of independent, non-deferential judicial determination of questions of law," at least when it came to "so-called mixed questions of law and fact." E. Bernick, Envisioning Administrative Procedure Act Originalism, 70 Admin. L. Rev. 807, 814 (2018);

see, *e.g.*, *Gray* v. *Powell*, 314 U. S. 402, 411–412 (1941); *NLRB* v. *Hearst Publications*, *Inc.*, 322 U. S. 111, 131 (1944). But it didn't take long for a chorus of prominent voices to denounce that prospect. For example, Roscoe Pound, a former Dean of Harvard Law School, led a committee of the American Bar Association (ABA) that protested against the "recen[t]" trend of "giving the interpretation of [statutes] to the executive, or to administrative officials"—a trend that Pound worried would lead to "administrative absolutism." The Place of the Judiciary in a Democratic Polity, 27 A. B. A. J. 133, 136–137 (1941) (Pound); see also *Gray*, 314 U. S., at 418–421 (Roberts, J., dissenting) (warning this Court against "abdicat[ing] its function as a court of review" and "complete[ly] revers[ing] . . . the normal and usual method of construing a statute").

In 1946, Congress put any question in this area to rest when it adopted the Administrative Procedure Act (APA). Despite sharp divisions along partisan lines, Congress passed the APA unanimously thanks to a "hard-fought compromise" based in part on proposals from Pound and the ABA. G. Shepherd, Fierce Compromise: The Administrative Procedure Act Emerges From New Deal Politics, 90 Nw. U. L. Rev. 1557, 1560, 1646–1647, 1649–1652 (1996). On the one hand, the APA allowed agencies to issue binding regulations and required courts to defer to agency factfindings. See 5 U. S. C. §§553, 556–557, 706(2)(E). On the other hand, the APA provided that courts "*shall decide all* relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of agency action." §706 (emphasis added); see also §§706(2)(A)–(C) (instructing courts to "hold unlawful and set aside" agency actions "not in accordance with law").

In short, the APA appeared "unequivocally to instruct courts to apply independent judgment on all questions of law." T. Merrill, The *Chevron* Doctrine: Its Rise and Fall,

and the Future of the Administrative State 47 (2022) (Merrill 2022). As a leading contemporary scholar of administrative law put it, the statute imposed a "clear mandate" for courts to decide questions of law "for [themselves] in the exercise of [their] own independent judgment." J. Dickinson, Administrative Procedure Act: Scope and Grounds of Broadened Judicial Review, 33 A. B. A. J. 434, 516 (1947). "More explicit words to impose this mandate could hardly be found." *Ibid.*

After the APA's passage, courts more or less followed this mandate faithfully for decades. As Justice Robert H. Jackson—himself an ardent New Dealer before joining the bench—explained, courts would respectfully *consider* Executive Branch interpretations of the law, but the weight courts afforded them "depend[ed] upon the[ir] thoroughness . . . , [their] consistency with earlier and later pronouncements, and all those factors which g[i]ve [them] power to persuade." *Skidmore* v. *Swift & Co.*, 323 U. S. 134, 140 (1944); accord, *United States* v. *American Trucking Assns., Inc.*, 310 U. S. 534, 544 (1940) ("The interpretation of the meaning of statutes, as applied to justiciable controversies, is exclusively a judicial function"). In fact, many prominent judicial opinions in the decades following the adoption of the APA never even *mentioned* Executive Branch interpretation of disputed statutory terms. See J. Beermann, End the Failed *Chevron* Experiment Now: How *Chevron* Has Failed and Why It Can and Should Be Overruled, 42 Conn. L. Rev. 779, 792 (2010).

As some tell it, *Chevron* effected a revolution in 1984. As the story goes, the decision overthrew all that came before and enshrined a new rule requiring courts to defer to Executive Branch interpretations of the law. No longer did executive officials have to be right about the law's meaning to prevail in court—all they had to do was point to some relevant statutory ambiguity or silence and avoid being egregiously wrong. The lower courts in this case adopted just

this line of reasoning when they turned aside Mr. Buffington's appeal.

That view of *Chevron*, however, reads too much into too little. Doubtless, *Chevron* contained language that later courts would read as representing a "significant departur[e]from prior law." T. Merrill, The Story of *Chevron*: The Making of an Accidental Landmark, 66 Admin. L. Rev. 253, 255 (2014) (Merrill 2014). Most notably, *Chevron* included a passage musing that, "if [a] statute is silent or ambiguous with respect to [a] specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." 467 U. S., at 843. But *Chevron* also proceeded to *restate* the traditional rule: "If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." *Ibid.*, and n. 9.

Tellingly, too, *Chevron* did not express disagreement with (let alone purport to overrule) precedents reciting the traditional rule that judges must exercise independent judgment about the law's meaning. Nor did the decision argue that the APA either tolerates or commands deference to Executive Branch views of the law. To the contrary, *Chevron* professed merely to apply "well-settled principles." *Id.*, at 845. Many of the cases *Chevron* cited to support its judgment stood only for the traditional proposition that courts afford respectful consideration, not deference, to executive interpretations of the law. See, *e.g.*, *Burnet*, 285 U. S., at 16 ("The Court is not bound by an administrative construction, and if that construction is not uniform and consistent, it will be taken into account only to the extent that it is supported by valid reasons"); *United States* v. *Moore*, 95 U. S. 760, 762–763 (1878) (an executive interpretation that had "always heretofore obtained" was "entitled to the most respectful consideration"). And the decision's sole citation to legal scholarship, 467 U. S., at 843, was to Roscoe Pound,

who long championed *de novo* judicial review. Pound 136–137.

If *Chevron* amounted to a revolution, it seems almost everyone missed it. The decision, issued by a bare quorum of the Court, sparked not a single word in concurrence or dissent. *Chevron*'s author, Justice Stevens, later characterized the decision as a "simpl[e] . . . restatement of existing law, nothing more or less." Merrill 2014, at 275, and n. 77. And in the "19 argued cases" in the following term "that presented some kind of question about whether the Court should defer to an agency interpretation of statutory law," this Court cited *Chevron* just once. Merrill 2014, at 276. By many estimations, *Chevron* seemed "destined to obscurity." Merrill 2014, at 276.

In truth, it took years for *Chevron* to morph into something truly revolutionary. Three years after *Chevron*, Justice Scalia wrote a concurrence that seized on its passing musings about deference and argued for a new rule requiring courts to defer to "reasonable" Executive Branch interpretations of the law whenever a "'statute is silent or ambiguous.'" *NLRB* v. *Food & Commercial Workers*, 484 U. S. 112, 133–134 (1987). Two years later, Justice Scalia continued his campaign in an academic article. See Judicial Deference to Administrative Interpretations of Law, 1989 Duke L. J. 511 (1989). Eventually, these efforts began to bear fruit as a majority of the Court came to embrace Justice Scalia's view. See Merrill 2022, at 93–94.

*

Over time, however, experience has exposed grave problems with this expansive reconstruction of *Chevron*. So much so that even the initial champion of the project came to express a change of heart. Not only does reading *Chevron* so broadly badly stretch the terms of the original decision. Not only does it call on courts to depart from the terms of

the APA and our longstanding and never-overruled precedent. It also turns out to pose a serious threat to some of our most fundamental commitments as judges and courts.

In this country, we like to boast that persons who come to court are entitled to have independent judges, not politically motivated actors, resolve their rights and duties under law. Here, we promise, individuals may appeal to neutral magistrates to resolve their disputes about "what the law is." *Marbury* v. *Madison*, 1 Cranch 137, 177 (1803). Everyone, we say, is entitled to a judicial decision "without respect to persons," 28 U. S. C. §453, and a "fair trial in a fair tribunal," *In re Murchison*, 349 U. S. 133, 136 (1955).

Under a broad reading of *Chevron*, however, courts often fail to deliver on all these promises. Rather than provide individuals with the best understanding of their rights and duties under law a neutral magistrate can muster, we outsource our interpretive responsibilities. Rather than say what the law is, we tell those who come before us to go ask a bureaucrat. In the process, we introduce into judicial proceedings a "systematic bias toward one of the parties." P. Hamburger, *Chevron* Bias, 84 Geo. Wash. L. Rev. 1187, 1212 (2016). Nor do we exhibit bias in favor of just any party. We place a finger on the scales of justice in favor of the most powerful of litigants, the federal government, and against everyone else. In these ways, a maximalist account of *Chevron* risks turning *Marbury* on its head.

Overreading *Chevron* introduces still other incongruities into our law. Often we insist that it is a basic requirement of due process that "'no man can be a judge in his own case.'" *Williams* v. *Pennsylvania*, 579 U. S. 1, 8–9 (2016). As far back as *Calder* v. *Bull*, 3 Dall. 386 (1798), this Court recognized that it would be "against all reason" to "entrust a Legislature" with the power to "mak[e] a man a Judge in his own cause," and therefore "it cannot be presumed that [the people] have done it," *id.*, at 388 (opinion of Chase, J.)

(emphasis deleted). Yet a broad reading of *Chevron* requires us to presume exactly that. So long as Executive Branch officials can identify a statutory ambiguity or silence, we must assume that the law permits them to judge the scope of their own powers and duties—at least so long as their decisions can be said to be "reasonable." See K. Saunders, Agency Interpretations and Judicial Review: A Search for Limitations on the Controlling Effect Given Agency Constructions, 30 Ariz. L. Rev. 769, 788–789 (1988).

Then there are the ancient doctrines of lenity and *contra proferentem*. From the founding, courts in this country have construed ambiguities in penal laws *against* the government and with lenity toward affected persons—here, we promise, our courts favor individual liberty, not prosecutors, prison time, and penal fines. See *Wooden* v. *United States*, 595 U. S. ___, ___ (2022) (GORSUCH, J., concurring in judgment) (slip op., at 6). Traditionally, too, our courts have long and often understood that, "as between the government and the individual[,] the benefit of the doubt" about the meaning of an ambiguous law must be "given to the individual, not to authority; for the state makes the laws." *Lane* v. *State*, 120 Neb. 302, 232 N. W. 96, 98 (1930); see, *e.g.*, *Caldwell* v. *State*, 115 Ohio St. 458, 460–461, 154 N. E. 792, 793 (1926). A rule requiring judicial deference to executive interpretations of statutory laws—especially laws that carry both civil and criminal penalties for their violation (as so many do)—cannot be easily reconciled with either of these historic commitments.

A broad reconstruction of *Chevron* defies still other norms. When reading statutes, we insist that courts pay careful attention to text, context, and traditional tools of interpretation. We demand interpretations that comport with how a reasonable reader would have understood the law at the time of its adoption. See, *e.g.*, *New Prime Inc.* v. *Oliveira*, 586 U. S. ___, ___ (2019). A rule requiring us to

suppose that statutory silences and ambiguities are both always intentional and always created by Congress to favor the government over its citizens fits with none of this. A rule like that is neither a traditional nor a reasonable way to read laws. It is a fiction through and through—and "one that requires a pretty hefty suspension of disbelief at that." *Gutierrez-Brizuela* v. *Lynch*, 834 F. 3d 1142, 1153 (CA10 2016) (Gorsuch, J., concurring).

Nor has the maximalist reading of *Chevron* even proven workable in practice. To this day, the federal government, *Chevron*'s biggest beneficiary, has yet to offer a coherent explanation for when a statute is sufficiently ambiguous to trigger deference. See, *e.g.*, Tr. of Oral Arg. in *American Hospital Assn.* v. *Becerra*, O. T. 2021, No. 20–1114, pp. 71–72 (Assistant to the Solicitor General: "I don't think I can give you an answer to th[e] question" of "[h]ow much ambiguity is enough"). Thanks to all this ambiguity about ambiguity, courts have pursued "wildly different" approaches. B. Kavanaugh, Fixing Statutory Interpretation, 129 Harv. L. Rev. 2118, 2152 (2016) (Kavanaugh). Along the way, too, *Chevron* has become pitted with exceptions and caveats—including for cases of "vast economic and political significance," *Utility Air Regulatory Group* v. *EPA*, 573 U. S. 302, 324 (2014) (internal quotation marks omitted), and those in which Congress has not delegated authority to an agency "to make rules with force of law," *United States* v. *Mead Corp.*, 533 U. S. 218, 237 (2001). Far from proving a clear and stable rule, the maximalist account of *Chevron* has left behind only a wake of uncertainty.

Overreading *Chevron* has profound consequences for how our government operates as well. It encourages executive officials to write ever more ambitious rules on the strength of ever thinner statutory terms, all in the hope that some later court will find their work to be at least marginally reasonable. When one administration departs and the next arrives, a broad reading of *Chevron* frees new officials to undo

the ambitious work of their predecessors and proceed in the opposite direction with equal zeal. In the process, we encourage executive agents not to aspire to fidelity to the statutes Congress has adopted, but to do what they might while they can. See R. Pierce, The Combination of *Chevron* and Political Polarity Has Awful Effects, 70 Duke L. J. Online 91, 92 (2021).

Consider the regulations before us. Some time ago, the VA promulgated a rule consistent with Congress's instructions, one providing that a veteran's disability benefits "may be resumed the day following [his] release from active duty." 26 Fed. Reg. 1599 (establishing 38 CFR §3.654(b)). In the years that followed, Congress did not amend its laws in any relevant way. Yet agency officials proceeded to revise their rules anyway to place new burdens on veterans and make their own jobs easier. Expansive views of *Chevron* encourage and reward just these sorts of self-serving gambits.

Overreading *Chevron* holds still other consequences for the rule of law. When the law's meaning is never liquidated by a final independent judicial decision, when executive agents can at any time replace one reasonable interpretation with another, individuals can never be sure of their legal rights and duties. Instead, they are left to guess what some executive official might "reasonably" decree the law to be today, tomorrow, next year, or after the next election. "[E]very relevant actor may agree" that the agency's latest pronouncement does not represent best interpretation of the law, yet all the same each new iteration "carries the force of law." Kavanaugh 2151. Fair notice gives way to vast uncertainty.

Nor does everyone suffer equally. Sophisticated entities may be able to find their way. They or their lawyers can follow the latest editions of the Code of Federal Regulations—the compilation of Executive Branch rules that now

clocks in at over 180,000 pages and sees thousands of further pages added each year. The powerful and wealthy can plan for and predict future regulatory changes. More than that, they can lobby agencies for new rules that match their preferences. Sometimes they can even capture the very agencies charged with regulating them. But what about ordinary Americans?

Today, administrative law doesn't confine itself to the regulation of large and sophisticated entities. Our administrative state "touches almost every aspect of daily life." *Free Enterprise Fund* v. *Public Company Accounting Oversight Bd.*, 561 U. S. 477, 499 (2010). And often it is ordinary individuals who are unexpectedly caught in the whipsaw of all the rule changes a broad reading of *Chevron* invites. Mr. Buffington's case illustrates the impact on disabled veterans. Those who left active service before the VA changed its rule received all their promised benefits; those who served later do not. Not because of any change in law, only a change in an agency's view. So many other individuals who interact with the federal government have found themselves facing similar fates—including retirees who depend on federal social security benefits, immigrants hoping to win lawful admission to this country, and those who seek federal health care benefits promised by law. See, *e.g.*, *Lambert* v. *Saul*, 980 F. 3d 1266, 1275–1276 (CA9 2020); *Valent* v. *Commissioner of Social Security*, 918 F. 3d 516, 525 (CA6 2019) (Kethledge, J., dissenting); *Gonzalez* v. *United States Atty. Gen.*, 820 F. 3d 399, 404–406 (CA11 2016) (*per curiam*); *Padilla-Caldera* v. *Holder*, 637 F. 3d 1140 (CA10 2011).

\*

With the passage of time, the problems with reading too much into *Chevron* have become widely appreciated. Even Justice Scalia reconsidered his earlier support for broad judicial deference to executive interpretations of the law. See

*Decker* v. *Northwest Environmental Defense Center*, 568 U. S. 597, 617–618, 621 (2013) (opinion concurring in part and dissenting in part) (calling on the Court to overrule the related *Auer* deference doctrine, which Justice Scalia had also pioneered); *Perez* v. *Mortgage Bankers Assn.*, 575 U. S. 92, 109–110 (2015) (opinion concurring in judgment). Many other Members of this Court have expressly questioned *Chevron* maximalism. See, *e.g.*, *Pereira* v. *Sessions*, 585 U. S. ___, ___ (2018) (Kennedy, J., concurring); *Michigan* v. *EPA*, 576 U. S. 743, 760–764 (2015) (THOMAS, J., concurring); *Arlington* v. *FCC*, 569 U. S. 290, 312–328 (2013) (ROBERTS, C. J., dissenting); *Gutierrez-Brizuela*, 834 F. 3d, at 1153 (Gorsuch, J., concurring); Kavanaugh 2150–2156. The federal government itself now often waives or forfeits arguments for *Chevron* deference before this Court—and it does so even in cases that might have once seemed obvious candidates for the doctrine's application. See, *e.g.*, *HollyFrontier Cheyenne Refining, LLC* v. *Renewable Fuels Assn.*, 594 U. S.___, ___ (2021) (slip op., at 11) (because the government did not seek *Chevron* deference we "decline[d] to consider" it). As a result of these developments, this Court has not invoked the broad reading of *Chevron* in many years.

Lower federal courts have also largely disavowed the project. One recent survey revealed that a substantial majority of federal appellate judges disapprove of the broad reading of *Chevron* and avoid applying it when they can. See A. Gluck & R. Posner, Statutory Interpretation on the Bench: A Survey of Forty-Two Judges on the Federal Courts of Appeals, 131 Harv. L. Rev. 1298, 1312–1313 (2018). An extraordinary number of federal judges have written about the problems associated with reading *Chevron* broadly too. See, *e.g.*, *Egan* v. *Delaware River Port Auth.*, 851 F. 3d 263, 278 (CA3 2017) (Jordan, J., concurring); *Voigt* v. *Coyote Creek Mining Co.*, 980 F. 3d 1191, 1203–1204 (CA8 2020) (Stras, J., dissenting); *Valent*, 918 F. 3d, at 524 (Kethledge,

J., dissenting); *United States* v. *Havis*, 907 F. 3d 439, 448–450 (CA6 2019) (Thapar, J., concurring), rev'd en banc, 927 F. 3d 382 (*per curiam*); *Carter* v. *Welles-Bowen Realty, Inc.*, 736 F. 3d 722, 729–736 (CA6 2013) (Sutton, J., concurring).

Other notable voices have also spoken. Several state courts have refused to import a broad understanding of *Chevron* in their own administrative law jurisprudence. See, *e.g.*, *Tetra Tech EC, Inc.* v. *Wisconsin Dept. of Revenue*, 2018 WI 75, ¶67, 382 Wis. 2d 496, 554–555, 914 N. W. 2d 21, 50; *Ellis-Hall Consultants* v. *Pub. Serv. Comm'n*, 2016 UT 34, ¶32, 379 P. 3d 1270, 1275; see generally L. Phillips, *Chevron* in the States? Not So Much, 89 Miss. L. J. 313, 364 (2020) (observing that most States have declined to follow *Chevron*). Fifteen States have filed an *amici* brief in this case asking us to follow their lead. Brief for Indiana et al. as *Amici Curiae* on Pet. for Cert. 1. And courts in other countries that often consult American administrative law practices have declined to adopt the doctrine. See, *e.g.*, K. Barnett & L. Vinson, *Chevron* Abroad, 96 Notre Dame L. Rev. 621, 651 (2020) (under British law, an "error of law" is generally "subject to judicial review de novo"); M. Bernatt, Transatlantic Perspective on Judicial Deference in Administrative Law, 22 Colum. J. European L. 275, 313 (2016) ("[I]t is clear, that there is no counterpart to the *Chevron* doctrine on the EU level"); E. Jordão & S. Rose-Ackerman, Judicial Review of Executive Policymaking in Advanced Democracies: Beyond Rights Review, 66 Admin. L. Rev. 1, 8 (2014).

Unsurprisingly given all this, the aggressive reading of *Chevron* has more or less fallen into desuetude—the government rarely invokes it, and courts even more rarely rely upon it. The Federal Circuit's decision at issue here is thus something of an outlier. And maybe that is a reason to deny review of this case. Maybe *Chevron* maximalism has died of its own weight and is already effectively buried. But even if all that's true, it offers little comfort for Mr. Buffington

and the future veterans who will be forced to live with the VA's rule and the Federal Circuit's precedent. The same goes for other Americans who still find themselves caught in *Chevron*'s maw from time to time. No measure of silence (on this Court's part) and no number of separate writings (on my part and so many others) will protect them. At this late hour, the whole project deserves a tombstone no one can miss. We should acknowledge forthrightly that *Chevron* did not undo, and could not have undone, the judicial duty to provide an independent judgment of the law's meaning in the cases that come before the Nation's courts. Someday soon I hope we might.